**FILED**

06/10/2021

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: OP 21-0125

OP 21-0125

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2021 MT 149

BOB BROWN, DOROTHY BRADLEY, VERNON FINLEY,
MAE NAN ELLINGSON, and the LEAGUE OF WOMEN
VOTERS OF MONTANA,

          Petitioners,

   v.

GREG GIANFORTE, Governor of Montana,

        Respondent,

  and

MONTANA STATE LEGISLATURE,

        Intervenor and Respondent.

ORIGINAL PROCEEDING:      Petition for Original Jurisdiction

COUNSEL OF RECORD:

      For Petitioners:

          A. Clifford Edwards, Edwards & Culver, Billings, Montana

          James H. Goetz, Goetz, Baldwin & Geddes, P.C., Bozeman, Montana

      For Respondent:

          Austin Knudsen, Montana Attorney General, David M.S. Dewhirst, Solicitor General, J. Stuart Segrest, Civil Bureau Chief, Aislinn W. Brown, Assistant Attorney General, Helena, Montana

          Anita Milanovich, Office of the Montana Governor, Helena, Montana

      For Intervenor:

          Emily Jones, Talia G. Damrow, Jones Law Firm, PLLC, Billings, Montana

For Amicus Montana Trial Lawyers Association:

Colin Gerstner, Gerstner Adam Law PLLC, Billings, Montana

Seamus Molloy, Knight Nicastro Mackay, Missoula, Montana

For Amicus Montana Defense Trial Lawyers:

Sean Goicoechea, Moore, Cockrell, Goicoechea & Johnson, P.C., Kalispell, Montana

For Amicus Mountain States Legal Foundation:

Cody J. Wisniewski, Mountain States Legal Foundation, Lakewood, Colorado

For Amicus Montana Family Foundation:

Jon Metropoulos, Metropoulos Law Firm, Helena, Montana

KD Feedback, Toole & Feedback, PLLC, Lincoln, Montana

Submitted on Briefs: May 12, 2021

Decided: June 10, 2021

Filed:

_____
Clerk

2

Justice James Jeremiah Shea delivered the Opinion of the Court.

¶1 In this original proceeding, Petitioners challenge the constitutionality of Senate Bill 140 ("SB 140"), a bill passed by the 2021 Montana Legislature and signed into law by the Governor. SB 140 abolishes Montana's Judicial Nomination Commission and the process that had previously been in place to screen applicants for vacancies on the Supreme Court and the District Courts and replaced it with a process by which any person who otherwise satisfies the eligibility requirements for a Supreme Court Justice or District Court Judge can be considered for appointment by the Governor provided they obtain letters of support from three Montana adults.

¶2 We address the following issues:

*Issue One: Do the Petitioners have standing to challenge the constitutionality of SB 140?*

*Issue Two: Whether urgency or emergency factors justify an original proceeding in this Court pursuant to M. R. App. P. 14(4)?*

*Issue Three: Does SB 140 violate Article VII, Section 8(2) of the Montana Constitution?*[1]

¶3 We conclude the Petitioners have standing to challenge the constitutionality of SB 140, and that urgent or emergency factors justify an original proceeding in this Court. We therefore grant the petition for writ and assume original jurisdiction over Petitioners'

---

[1] Although Petitioners frame their constitutional challenge as "whether SB 140 is unconstitutional under Article VII of the Montana Constitution," it can more precisely be framed as whether SB 140 is unconstitutional under Article VII, Section 8(2) of the Montana Constitution, which provides that when a vacancy occurs on the Supreme Court or one of the District Courts, "the governor shall appoint a replacement from nominees selected in the manner provided by law."

3

constitutional challenge. We conclude that SB 140 does not violate Article VII, Section 8(2) of the Montana Constitution.

## BACKGROUND

¶4 The original Montana Constitution of 1889 provided that in case of a vacancy on the Supreme Court, or any of the District Courts, the vacancy "shall be filled by appointment, by the governor of the State." Mont. Const. art. VIII, § 34 (1889). This procedure was changed by ratification of the 1972 Constitution, which provided that in case of judicial vacancies, the Governor would appoint a replacement from nominees selected in a manner provided by law. Mont. Const. art. VII, § 8.

¶5 Pursuant to the newly ratified Constitution, the 1973 Legislature passed Senate Bill 28 ("SB 28"), which was codified at § 3-1-1001, MCA, et seq., and provided for the creation of a "Judicial Nomination Commission." The Commission was composed of seven members, appointed to staggered four-year terms: four lay members were appointed by the Governor, two attorney members were appointed by the Supreme Court, and the final member was a sitting district court judge. The procedure enacted by SB 28 provided that when there was a judicial vacancy, any individual who satisfied the constitutional requirements to serve as a Supreme Court Justice or District Court Judge could submit an application to the Commission for that position. After a public comment period, the Commission would then screen the applicants and forward a list of three to five nominees from which the Governor could appoint a replacement to fill the vacancy. The appointee would then stand for election at the next election and, if elected, for all

4

subsequent elections in the regular course. Depending on the timing of the appointment, the appointee may also be subject to Senate confirmation.[2]

¶6      The commission system enacted in 1973 remained the procedure for filling judicial vacancies until this year, when the 2021 Legislature passed SB 140. SB 140 abolished the Judicial Nomination Commission and replaced it with a procedure by which any individual who otherwise satisfies the constitutional requirements to serve as a Supreme Court Justice or District Court Judge may apply directly to the Governor. After a public comment period, the Governor may appoint any applicant who has received a letter of support from at least three Montana adults. As with the previous system, the appointee would then stand for election at the next election and, if elected, for all subsequent elections in the regular course and, depending on the timing of the appointment, the appointee may also be subject to Senate confirmation.

## STANDARDS OF REVIEW

¶7      The determination of a party's standing is a question of law that we review de novo. *Cmty. Ass'n for N. Shore Conservation, Inc. v. Flathead Cty.*, 2019 MT 147, ¶ 18, 396 Mont. 194, 445 P.3d 1195. We exercise plenary review over matters of constitutional interpretation. *Nelson v. City of Billings*, 2018 MT 36, ¶ 8, 390 Mont. 290, 412 P.3d 1058.

---

[2] Senate confirmation is required for every interim appointment except in two specific circumstances: (1) if the appointment is made while the Senate is not in session and the term to which the appointee is appointed expires prior to the next legislative session, or (2) if a general election will be held prior to the next legislative session and the appointment is made prior to the candidate filing deadline for primary elections, in which case the position is subject to election at the next primary and general elections. Section 3-1-1013(2)(a)–(b), MCA (2019).

**DISCUSSION**

¶8     *Issue One: Do the Petitioners have standing to challenge the constitutionality of SB 140?*

¶9     "Standing is a threshold jurisdictional requirement that limits Montana courts to deciding only cases or controversies (case-or-controversy standing) within judicially created prudential limitations (prudential standing). . . . Case-or-controversy standing limits the courts to deciding actual, redressable controversy, while prudential standing confines the courts to a role consistent with the separation of powers." *Bullock v. Fox*, 2019 MT 50, ¶ 28, 395 Mont. 35, 435 P.3d 1187 (citations omitted).

¶10    In order to establish case-or-controversy standing, Petitioners must "clearly allege past, present, or threatened injury to a property or civil right." *Bullock*, ¶ 31. The question is not whether the issue itself is justiciable, but whether the Petitioners are the proper party to seek redress in this controversy. In that regard, the injury Petitioners allege must be "concrete, meaning actual or imminent, and not abstract, conjectural, or hypothetical; redressable; and distinguishable from injury to the public generally." *Bullock*, ¶ 31.

¶11    The individual Petitioners in this case are all Montana residents, voters, and taxpayers. Petitioners cite a number of cases in which this Court has found standing in cases involving constitutional challenges based on purported violations of Article VII: *Committee for an Effective Judiciary v. State*, 209 Mont. 105, 679 P.2d 1223 (1984); *Jones v. Judge*, 176 Mont. 251, 577 P.2d 846 (1978); *Keller v. Smith*, 170 Mont. 399, 401, 553 P.2d 1002, 1004 (1976); *Yunker v. Murray*, 170 Mont. 427, 554 P.2d 285 (1976); *Reichert v. State ex rel. McCulloch*, 2012 MT 111, 365 Mont. 92,

6

278 P.3d 455. In all of these cases, Petitioners note, this Court has found standing based on the challenging parties' status as electors, citizens, and/or taxpayers.

¶12 Respondents respond that the individual Petitioners' status as Montana residents, voters, and taxpayers is insufficient to confer standing in this case. The Governor argues that the cases cited by Petitioners are distinguishable from the present case because "SB 140 has nothing to do with judicial elections, unlike those challenges to judicial election laws where this Court has accepted original jurisdiction." Similarly, the Legislature argues that the individual Petitioners' status as Montana residents and voters is insufficient because "[v]oters have no right to select nominees for appointment to judicial vacancies or to determine how nominees are selected."

¶13 Respondents are correct that SB 140 has nothing to do with judicial elections. It does, however, have to do with the process by which judicial vacancies are filled. Critical to the constitutionality of that process is the manner by which the nominees are selected to fill that vacancy. Among other criteria, SB 140 provides that in order to be considered a nominee for a judicial vacancy, an applicant must "receive[] a letter of support from at least three adult Montana residents by the close of the public comment period." While the Legislature may be correct that "*[v]oters* have no right to . . . determine how [judicial] nominees are selected" (emphasis added), in fact all adult Montana residents, regardless of their voter registration status, are integral to the process of determining how judicial nominees are selected.

7

¶14     Moreover, if we were to hold SB 140 unconstitutional, a judge appointed pursuant to its provisions would not be vested with judicial power and therefore would not be a judge at all.  This Court has addressed judicial appointments in a number of previous cases; our reasoning and analysis of those matters is instructive here.  In *Blodgett v. Orzech*, 2012 MT 134, 365 Mont. 290, 280 P.3d 904, we considered whether a substitute justice of the peace was properly appointed according to statute and able to oversee a trial.  In *Potter v. Dist. Court of the Sixteenth Judicial Dist.*, 266 Mont. 384, 880 P.2d 1319 (1994), we considered whether a substitute justice of the peace was properly appointed and thus able to issue search warrants.  And in *Pinnow v. Mont. State Fund*, 2007 MT 332, 340 Mont. 217, 172 P.3d 1273, we considered the substitution of a district court judge for a Worker's Compensation Court judge.  These cases demonstrate important propositions. First, the statutes through which a person is vested with judicial authority set forth intelligible standards and are subject to judicial review.  Although *Orzech*, *Potter*, and *Pinnow* considered only the compliance with statutory requirements, it is axiomatic that if a court can interpret a statute, it also can review its constitutionality.  *See Driscoll v. Stapleton*, 2020 MT 247, ¶ 11 n.3, 401 Mont. 405, 473 P.3d 386; *see generally Marbury v. Madison*, 5 U.S. 137, 167, 177-78 (1803); *Gen. Agric. Corp. v. Moore*, 166 Mont. 510, 515-16, 534 P.2d 859, 862-63 (1975).

¶15     More pertinent to the discussion of an "injury" sufficient to confer standing, these cases illustrate that if an appointing statute is not followed, judicial power never vests in the appointee.  Simply put, the appointed person is not a judge and any judicial acts he or she purports to make are void.  *Orzech*, ¶ 22 ("[U]nless the procedures required . . . are

8

followed, then no substitute justice is appointed, and the person seeking to exercise the powers of a judge as his substitute has no authority or jurisdiction to do so. That person is, quite simply, not a judge as he has not been vested by law with the power to perform the functions of a judge.") (citing *Pinnow*, ¶ 24; *Potter*, 266 Mont. at 393, 880 P.2d at 1325). Therefore, any party appearing before a judge has standing to argue that the judge was not vested properly with judicial authority and thus cannot perform the functions of a judge.

¶16 Here, we are concerned not with a substitute justice of the peace who may handle a small number of cases or issue a few warrants, nor with a judge overseeing a single workers compensation matter. Rather, the appointed judge will be a district court judge whose rulings will impact hundreds of litigants, criminal defendants, and third parties. If we were to conclude that Petitioners lack standing, once a judge is appointed pursuant to SB 140 any person appearing before that judge or subject to his or her authority would have standing to challenge SB 140's constitutionality. As a practical matter, should SB 140 be found unconstitutional through the normal course of litigation and appeals after an appointed judge presides in the case, motions, briefs, or hearings in any affected cases would need to be re-heard, and warrants, orders, or sentences the judge issued would be voided. Needless to say, resolving such a situation would come at great expense in time and money to the county, the judicial system, and the individual litigants.

¶17 Even more, the practical aspects of that situation are overshadowed by the constitutional and due process implications. In this nation, both at the federal and state level, all legal authority is derived first and foremost from the constitution and then from the statutes implementing its provisions. A judge's authority is wide and far-reaching: the

9

judge may compel payments of fees and awards, divest litigants of their property, declare a defendant's guilt or innocence, sentence offenders to prison, separate families, and otherwise strip people of the civil and political rights to which they are guaranteed. Judges may perform these acts only so long as they are vested by law—as prescribed by the constitution—with judicial authority.[3]

¶18    As it stands, the only current judicial vacancy is in Cascade County. No Petitioner lives there or claims to have any matter pending in that county. A district court, however, has statewide jurisdiction, §§ 3-5-302, -303, MCA, and its orders in many cases may affect individuals who have no desire of their own to file suit or otherwise appear before the court. Money can be regained, orders overruled, and certain rights restored, but the fundamental violation of a person's rights to due process, individual dignity, and liberty that would occur should a "judge" with no vested judicial authority, acting in the name of the State, compel that person to act or not act, or adjudicate rights regarding property or the law, is irreparable.

¶19    Were Petitioners correct in their argument that SB 140 is unconstitutional, in the near future there would be a person in Cascade County with no vested authority acting— in the literal sense—as a judge. The seriousness of such a "judge" unlawfully wielding authority that may affect the Petitioners is a sufficiently clear threat to Petitioners' property

---

[3] This authority goes beyond whether or not a judge's rulings are legally correct, biased, or otherwise improper. Even if the rulings are subject to appeal, a person not vested with judicial authority pursuant to the law and the constitution has no authority to compel action or to order a deprivation of liberty or property.

10

or civil rights to meet the case-or-controversy requirement for standing and one that this Court can resolve by ruling on the merits of Petitioners' claim.

¶20 Having concluded that Petitioners have satisfied case-or-controversy standing, we next consider whether Petitioners' challenge exceeds prudential standing limitations. Prudential standing is a form of "judicial self-governance" that discretionarily limits the exercise of judicial authority consistent with the separation of powers. *Heffernan v. Missoula City Council*, 2011 MT 91, ¶ 32, 360 Mont. 207, 255 P.3d 80. "[C]ourts generally should not adjudicate matters 'more appropriately' in the domain of the legislative or executive branches or the reserved political power of the people." *Larson v. State*, 2019 MT 28, ¶ 18 n.6, 394 Mont. 167, 434 P.3d 241 (citing *Heffernan*, ¶¶ 32-33).

¶21 The Montana Constitution provides that "[n]o person or persons charged with the exercise of power properly belonging to one branch shall exercise any power properly belonging to either of the others, except as in this constitution expressly directed or permitted." Mont. Const. art. III, § 1. An issue is not properly before the judiciary when "there is a textually demonstrable constitutional commitment of the issue to a coordinate political department or a lack of judicially discoverable and manageable standards for resolving" the issue. *Nixon v. United States*, 506 U.S. 224, 228, 113 S. Ct. 732, 735 (1993). However, "not every matter touching on politics is a political question." *Japan Whaling Ass'n v. Am. Cetacean Soc'y.*, 478 U.S. 221, 229, 106 S. Ct. 2860, 2865 (1986).

¶22 The Governor argues that we should reject jurisdiction under the doctrine of prudential standing because "the Montana Constitution unambiguously grants authority to the Legislature to determine how nominees for a judicial vacancy are presented to the

11

Governor," citing Article VII, Section 8(2). The Governor argues that it would therefore violate the separation of powers for this Court to second-guess those determinations. We disagree.

¶23 "Both the United States Supreme Court and this Court recognize that non-self-executing clauses of constitutions are non-justiciable political questions." *Columbia Falls Elem. Sch. Dist. No. 6 v. State*, 2005 MT 69, ¶ 15, 326 Mont. 304, 109 P.3d 257 (citing *Baker v. Carr*, 369 U.S. 186, 82 S. Ct. 691 (1962)). "To determine whether a provision is self-executing, we ask whether the Constitution addresses the language to the courts or to the Legislature." *Columbia Falls Elem. Sch. Dist.*, ¶ 16. Article VII, Section 8(2) directs the Legislature to prescribe a manner by which nominees are selected for appointment by the Governor to a judicial vacancy; it is therefore non-self-executing. However, once the Legislature has acted, or "executed," a provision that implicates individual constitutional rights, courts can determine whether that enactment fulfills the Legislature's constitutional responsibility. *Columbia Falls Elem. Sch. Dist.*, ¶ 17 (citing *City of Boerne v. Flores*, 521 U.S. 507, 117 S. Ct. 2157 (1997) (determining, under the First Amendment, that the Religious Freedom Restoration Act of 1993 violates the Constitution despite Congress specifically implementing the Act through Section 5 of the Fourteenth Amendment, that provides that "the Congress shall have power to enforce, by appropriate legislation, the provisions of this article.")).

> Provisions that directly implicate rights guaranteed to individuals under our Constitution are in a category of their own. That is, although the provision may be non-self-executing, thus requiring initial legislative action, the courts, as final interpreters of the Constitution, have the final "obligation to

guard, enforce, and protect every right granted or secured by the Constitution . . . ."

*Columbia Falls Elem. Sch. Dist.*, ¶ 18 (quoting *Robb v. Connolly*, 111 U.S. 624, 637, 4 S. Ct. 544, 551 (1884).

¶24 Although the Governor is correct that the Montana Constitution grants the authority to the Legislature to determine how nominees for a judicial vacancy are presented to the Governor, that authority must nevertheless be exercised in compliance with the provisions of the Constitution. The very heart of this dispute is whether SB 140 comports with the provisions of Article VII, Section 8(2) of the Montana Constitution. Since *Marbury*, it has been accepted that determining the constitutionality of a statute is the exclusive province of the judicial branch. It is circular logic to suggest that a court cannot consider whether a statute complies with a particular constitutional provision because the same constitutional provision forecloses such consideration. We therefore conclude that prudential standing does not bar our consideration of the petition.

¶25 *Issue Two: Whether urgency or emergency factors justify an original proceeding in this Court pursuant to M. R. App. P. 14(4)?*

¶26 This Court accepts original jurisdiction "when urgency or emergency factors exist making litigation in the trial courts and the normal appeal process inadequate and when the case involves purely legal questions of statutory or constitutional interpretation which are of state-wide importance." M. R. App. P. 14(4). Original proceedings are appropriate only where: "(1) constitutional issues of major statewide importance are involved; (2) the case involves purely legal questions of statutory and constitutional construction; and (3) urgency

13

and emergency factors exist making the normal appeal process inadequate." *Hernandez v. Bd. of Cty. Comm'rs*, 2008 MT 251, ¶ 9, 345 Mont. 1, 189 P.3d 638 (citation omitted).

¶27 Petitioners contend that all three factors are satisfied in this case. They note that this is an issue of statewide importance because it impacts the appointment process for Supreme Court Justices and District Court Judges statewide; the case involves purely an interpretation of Article VII, Section 8 of the Montana Constitution and whether the procedure set forth in SB 140 complies; and urgency and emergency factors exist making the normal appeal process inadequate because SB 140 is effective immediately, thus any judicial vacancies will be filled by a process which Petitioners contend is unconstitutional. Petitioners further note that, at the time of filing their Petition, there were three judicial appointments whose confirmations were pending before the Senate.

¶28 Of the three criteria, Respondents address only the final criterion: whether urgency and emergency factors exist making the normal appeal process inadequate. The Governor responds that Petitioners' concerns are speculative because, as of the time the Governor's response brief was filed, there were no judicial vacancies which would be subject to the SB 140 process. Regarding the three judicial appointments that were pending confirmation at the time of the Governor's brief, the Governor noted: "Petitioners' true concerns arise only if the Senate rejects those appointments, and the Governor then appoints individuals who were not among those forwarded by the Judicial Nomination Commission." Similarly, the Legislature responded that Petitioners' fears of a judge being appointed by way of an ostensibly unconstitutional appointment process will never be realized if the three

14

appointees pending before the Senate at the time of the Legislature's brief are confirmed because "[t]here are no other current vacancies."

¶29 In the time since both Respondents' briefs were filed, the Senate has rejected the appointment of one of the three appointees, thus creating a vacancy in the Eighth Judicial District. The process for filling that vacancy pursuant to SB 140 has begun. To the extent that Petitioners' concerns that a judicial vacancy may be filled via the SB 140 process may have been speculative, they obviously are not speculative any longer.

¶30 As discussed above, if Petitioners' constitutional challenge to SB 140 was ultimately sustained, it would render any rulings by an individual appointed to the current vacancy in the Eighth Judicial District void ab initio. In that event, rulings of life-altering gravity, including criminal sentences, civil judgments, and termination of parental rights, would be ordered by an individual with "no more authority than any other member of the general public," while a challenge filed in district court worked its way to this Court in the normal appeal process. *Pinnow*, ¶ 25. This is a wholly untenable situation. Thus, urgency or emergency factors exist making litigation in the trial courts and the normal appeal process inadequate.

¶31 *Issue Three: Does SB 140 violate Article VII, Section 8(2) of the Montana Constitution?*

¶32 "Statutes are presumed to be constitutional, and it is the duty of this Court to avoid an unconstitutional interpretation if possible." *Hernandez*, ¶ 15 (citing *Montanans for the Responsible Use of the School Trust v. State ex rel. Bd. of Land Comm'rs*, 1999 MT 263, ¶ 11, 296 Mont. 402, 989 P.2d 800; *State v. Nye*, 283 Mont. 505, 510, 943 P.2d 96,

15

99 (1997)). The party challenging a statute's constitutionality bears the heavy burden of proving the statute is unconstitutional "beyond a reasonable doubt." *Molnar v. Fox*, 2013 MT 132, ¶ 49, 370 Mont. 238, 301 P.3d 824.

¶33 When interpreting constitutional provisions, we apply the same rules as those used in construing statutes. *Nelson v. City of Billings*, 2018 MT 36, ¶ 14, 390 Mont. 290, 412 P.3d 1058. But just as with statutory interpretation, constitutional construction should not "lead to absurd results, if reasonable construction will avoid it." *Nelson*, ¶ 16 (citing *Grossman v. Mont. Dep't of Natural Res.*, 209 Mont. 427, 451, 682 P.2d 1319, 1332 (1984)). "The principle of reasonable construction 'allows courts to fulfill their adjudicatory mandate and preserve the [Framers'] objective.'" *Nelson*, ¶ 16 (citation omitted). Thus:

> Even in the context of clear and unambiguous language . . . we have long held that we must determine constitutional intent not only from the plain meaning of the language used, but also in light of the historical and surrounding circumstances under which the Framers drafted the Constitution, the nature of the subject matter they faced, and the objective they sought to achieve.

*Nelson*, ¶ 14 (citations omitted).

¶34 The constitutional provision at the heart of this dispute, Article VII, Section 8(2), provides in relevant part: "For any vacancy in the office of supreme court justice or district court judge, the governor shall appoint a replacement from nominees selected in the manner provided by law." Petitioners contend that SB 140 violates Article VII, Section 8(2) to the extent that it abolished the Judicial Nomination Commission and replaced it with a different procedure by which judicial nominees may be selected.

16

Petitioners point to the 1972 Constitutional Convention transcripts as evidence that the delegates intended to require a commission-type of selection process. While we also deem it appropriate in this case to consider the Constitutional Convention transcripts to determine the Framers' intent in the drafting of Article VII, Section 8(2), *Nelson*, ¶ 14, our consideration does not lead us to the same conclusion as Petitioners—that the commission process was the *only* agreed-upon method by which judicial nominees could be selected.

¶35    The Convention transcripts reveal drastically divergent views as to how judicial vacancies should be filled. While some delegates envisioned a commission process that would supply a limited number of names from which the Governor's appointment must be made, others advocated for a system that would vest even greater discretion in the Governor in making appointments than that which was prescribed by the 1889 Constitution.

¶36    Most notable of those who would vest essentially unfettered power in the Governor to make judicial appointments was Delegate Joyce. Delegate Joyce introduced an amendment that not only would have retained the direct appointment system of the 1889 Constitution, but would have eliminated the requirement that the Governor's appointee be confirmed by the senate. Montana Constitutional Convention, Verbatim Transcript, February 29, 1972, Vol. IV, p. 1104. Advocating for his amendment, Delegate Joyce stated:

> Mr. Chairman. Getting to the heart of the matter on the commission system, may I submit to the delegates this consideration. In the first place, no matter how astute or how brilliant or how able or how fairly the Legislative Assembly may set up a commission to select these nominees, you cannot take the human element out of the situation. . . . [I]t seems to me that we're just beating around the bush by having a commission and we ought to leave it up to the discretion of whoever is Governor to pick who he wants to fill that

17

vacancy. He can appoint any number of commissions, consult with the bar, consult with anybody he wants as to who he wants to select. And, of course, we are always limited as to who wants the job. And so it will, inevitably, narrow down to some people vying for the job. And I think we can trust the Governor to pick whom he thinks is the best man. . . . [I]t seems to me that the committee system doesn't add anything at all to it and that the Governor, if we elect capable, honest, sincere governors, will make a choice of who he thinks will be a good judge on the bench of either the District or the Supreme Court.

Montana Constitutional Convention, Verbatim Transcript, February 29, 1972, Vol. IV, pp. 1104-05. Though not part of his proposed amendment, the only other modification to the direct appointment process that Delegate Joyce advocated for was a requirement that the Governor provide reasonable notice before making the appointment "to see if there wouldn't be a great hullabaloo go up around the state." Montana Constitutional Convention, Verbatim Transcript, February 29, 1972, Vol. IV, p. 1105.

¶37 Delegate Joyce's motion that would have retained the direct appointment process and eliminated the senate confirmation requirement was defeated by a vote of 69 to 26. Montana Constitutional Convention, Verbatim Transcript, February 29, 1972, Vol. IV, p. 1106. It illustrates, though, that contrary to Petitioners' contention that "all delegates envisioned a judicial nomination commission/committee," this was far from the case. In fact, among the delegates who voted for Delegate Joyce's proposal, some questioned whether a nominating commission could be fair and independent:

DELEGATE HOLLAND: "How can we guarantee that this commission— the ones that name the candidates—won't be dominated by some special interest group?"

.   .   .

18

DELEGATE DAVIS: You can say what you want, any select committee's going to be a committee of the establishment. There's just no other way to get around it . . .

.    .    .

DELEGATE MCKEON: I'm afraid, Mr. Chairman, that any committee, whether it be select, blue-ribbon or whatnot, will not be a committee whose interests are the interests of the people.

Montana Constitutional Convention, Verbatim Transcript, February 29, 1972, Vol IV, pp. 1092, 1093, 1096.

¶38    To be sure, there were proponents of a commission system as well. Notable among the committee/commission proponents was Delegate Berg. Delegate Berg advocated for what he referred to as a "blue-ribbon system," in which a committee or commission would submit a limited number of nominees to the Governor. Montana Constitutional Convention, Verbatim Transcript, February 29, 1972, Vol. IV, pp. 1088-95. The Governor then would be required to appoint from the list of nominees. Advocating for his proposal, Delegate Berg stated:

> Now, there's been a good deal of criticism about the so-called blue-ribbon committee that would be created by the Legislature. I suggest to you that that committee, committing two to three or four names to the Governor, is going to give the Governor a fairly wide selection of nominees, and he can select what he wants—whom he wants—from that committee. But, at least, you have the assurance that that nominee has been screened, that he does meet the qualifications of what you want in a good judge. This is a feature you do not have now, and I must recall to you that this proposition will be used not only on the selection of district judges, but, more importantly, on the selection of Supreme Court judges. That is, nominees, candidates for the Supreme Court judge—or the Supreme Court justice will have been screened for their qualifications to sit on that bench.

Montana Constitutional Convention, Verbatim Transcript, February 29, 1972, Vol. IV, p. 1094.

19

¶39    What emerged from these diametrically opposed proposals was a compromise, proposed by Delegate Melvin, that neither required the creation of a commission/committee, nor precluded it.  The Melvin amendment passed unanimously, and is what ultimately became Article VII, Section 8(2).  Montana Constitutional Convention, Verbatim Transcript, February 29, 1972, Vol. IV, pp. 1113-14.

¶40    Petitioners argue that "[a]lthough the Constitution left the details to the Legislature, the transcripts leave no doubt that the framers envisioned a separate 'commission' to evaluate and nominate the 'nominees.'"  In this case, however, the devil is in the details.  Petitioners rely on statements by individual delegates—some of which are statements *criticizing* the idea of a nominating commission—and make the unsupported leap that [i]t was clear . . . that **all** delegates understood that the proposal envisioned a separate 'commission/committee' to be established to select a list of 'nominees.'"  (Emphasis in original.)  And yet neither the words "commission" nor "committee" appear anywhere in Article VII, Section 8(2).

¶41    Both the language of Article VII, Section 8(2), and the circumstances and objectives evinced from the Constitutional Convention debates, make clear that while some individual delegates supported a committee or commission to screen candidates for a judicial vacancy, others voiced distrust in such a commission and supported a process that would have vested virtually unfettered discretion in the Governor.  As is the nature of compromise, the result was a system that was not entirely what either side wanted—a process that neither mandated a commission/committee, nor precluded it, but rather delegated the process for

20

selecting nominees to the Legislature in broad language that the selection of nominees be "in the manner provided by law."

¶42    Although the Constitution delegates the process for selecting judicial nominees to the Legislature, the process itself is not without constitutional bounds. The delegates may have disagreed as to what would be the best process for making judicial appointments, but the clear constitutional intent of Article VII, Section 8(2) was a process that would result in the appointment of good judges. As summed up by Delegate Garlington: "There is clear agreement on the part of all that we do need good judges. . . . The question is how to recruit them." Montana Constitutional Convention, Verbatim Transcript, February 26, 1972, Vol. IV, p. 1032.

¶43    "We have long held that we must determine constitutional intent not only from the plain meaning of the language used, but also in light of the historical and surrounding circumstances under which the Framers drafted the Constitution, the nature of the subject matter they faced, and the objective they sought to achieve." *Nelson*, ¶ 14. The manifest constitutional objective of Article VII, Section 8(2) was the appointment of good judges. The fact that the process does not require a commission to achieve that objective does not mean that any process will be constitutionally sound. We therefore must still consider whether SB 140 achieves the constitutional objective the Framers sought to achieve by the enactment of Article VII, Section 8(2).

¶44    Although there are some key differences between SB 140 and the commission process it replaces, many aspects of the SB 140 process are not appreciably different. Both processes require applicants to be lawyers in good standing who satisfy the qualifications

21

set forth by law for holding judicial office; both processes provide for a period of time for the submission of applications, followed by a public comment period of at least 30 days; both processes allow the Governor no more than 30 days to make the appointment, after which time the appointment shall be made by the Chief Justice; finally, both processes require Senate confirmation for all interim appointments and election for the remainder of the term.

¶45    Where the respective processes diverge is the "selection" process by which an "applicant" for a judicial vacancy becomes a "nominee" who the Governor may consider for appointment to the position. The commission process provided that after screening the applicants for the position, the Commission was required to submit to the governor a list of "not less than three or more than five nominees for appointment to the vacant position." Section 3-1-1010(1), MCA (2019). The list of nominees must be accompanied by a written report indicating the vote on each nominee, the content of the application submitted by each nominee, letters and public comments received regarding each nominee, and the Commission's reasons for recommending each nominee for appointment. The report must give specific reasons for recommending each nominee. Section 3-1-1010(2), MCA (2019).

¶46    In contrast to the commission process, the selection process of SB 140 requires that an applicant "receives a letter of support from at least three adult Montana residents by the close of the public comment period," in order to be considered a nominee eligible for appointment by the Governor. Petitioners describe this process as "a crude attempt" to replace the commission process that provided "a list of nominees carefully vetted by an independent source." At the end of the day, however, it is not the task of this Court to

assess the relative "crudeness" of the process; it is to assess the constitutionality of the process within the requirements of Article VII, Section 8(2).

¶47 Petitioners equate the absence of a commission to screen the candidates with the lack of a vetting process. But this argument ignores the very public vetting to which all applicants for a judicial vacancy are subjected during the public comment period. Indeed, it could be argued that SB 140 meets the Convention delegates' concern about selecting "good judges" by incorporating at least part of Delegate Joyce's objective—allowing the Governor to make a direct appointment after providing reasonable notice "to see if there wouldn't be a great hullabaloo go up around the state." Montana Constitutional Convention, Verbatim Transcript, February 29, 1972, Vol. IV, p. 1105. As any individual who might consider applying for a judicial appointment is no doubt aware, the internet is a hullabaloo-friendly place. Thus, it can hardly be said that the lack of a nominating commission means that applicants for judicial vacancies will not be subject to a vetting process.

¶48 Petitioners' argument also ignores the vetting to which the appointee will be subjected by the Senate in order to be confirmed. Finally, Petitioners' argument ignores the most critical vetting process—the vetting by the voters to which the appointee will ultimately be subjected at the next election.

¶49 As for the requirement that an applicant receive a letter of support from three adult Montana residents in order to be considered a "nominee" eligible for appointment to the bench, Petitioners argue that this is nothing more than "equating an 'applicant' with the term 'nominee' [and] does not salvage constitutionality." Although it could be argued that

23

this lowers the bar for an applicant to be forwarded to the Governor for consideration, it must be noted that under the commission process, an applicant could be forwarded onto the Governor for consideration with *no* public support. And while an applicant in the commission process with no public support would still have to be recommended by at least four members of the Commission, § 3-1-1008, MCA (2019), it is also true that the necessary four votes could come solely from members who had been appointed by the Governor. Section 3-1-1001(1)(a), MCA (2019).

¶50 This in no way is intended to impugn the hard work and dedicated service that Commission members have put in over the past forty-eight years. As Petitioners correctly point out, the Judicial Nomination Commission has been in place since 1973. During this time, its members have included appointees from all over the State, who have been appointed by governors of both parties and this Court, as well as selected by the district court judges from across the State, seeking to honor the constitutional objective of recruiting good judges to serve the citizens of Montana. During the debate over SB 140, some contended that the Commission should continue unaltered, some contended that it should be modified, and some contended that it should be abolished. In the final analysis, however, it is not the function of this Court to determine which process we think is the better process for making judicial appointments—it is to determine whether the process prescribed by SB 140, which is presumed to be constitutional, complies with the language and constitutional intent of Article VII, Section 8(2). We conclude that it does.

## CONCLUSION

¶51 Petitioners have standing to bring this petition. Urgency or emergency factors justify an original proceeding in this Court pursuant to M. R. App. P. 14(4). We therefore grant the petition for writ and assume original jurisdiction over Petitioners' constitutional challenge. For the reasons stated above, we conclude that SB 140 does not violate Article VII, Section 8(2) of the Montana Constitution.

/S/ JAMES JEREMIAH SHEA

We Concur:

/S/ BETH BAKER
/S/ DIRK M. SANDEFUR
/S/ INGRID GUSTAFSON
/S/ JIM RICE
/S/ MATTHEW WALD
District Court Judge Matthew Wald
sitting for Chief Justice Mike McGrath

Justice Jim Rice concurring.

¶52 I concur with the Court's decision, but write to address the extraordinary, indeed, extraconstitutional, actions taken by the Legislature and the Department of Justice during the pendency of this proceeding.

¶53 On April 12, 2021, a letter addressed to me as Acting Chief Justice in this proceeding, OP 21-0125, was delivered to the Court by the Department of Justice in its stated role as counsel for the State Legislature, regarding the Temporary Order issued by the Court on April 11, temporarily quashing a legislative subpoena issued to the Court Administrator, pending briefing on the matter. The letter expressed displeasure with the

25

Court's Order, cited the Separation of Powers provision of the Montana Constitution, Art. III, § 1, and advised:

> [t]he Legislature does not recognize this Court's Order as binding and will not abide it. The Legislature will not entertain the Court's interference in the Legislature's investigation of the serious and troubling conduct of members of the Judiciary. The subpoena is valid and will be enforced.

*Letter from Montana Department of Justice to Acting Chief Justice*, April 12, 2021.

¶54    Obviously contemptuous, the letter was followed by another letter from the Attorney General on behalf of the Legislature on April 18, 2021, addressed to the Justices of this Court, this one disputing the Order entered in this matter by the Court on April 16, 2021, and describing the Court's statement therein that the Court would provide due process in the matter as "ludicrous" and "wholly outside the bounds of rational thought." *Letter from Montana Attorney General to Justices of the Montana Supreme Court*, April 18, 2021. It likewise insisted that, despite the Court's order, "[t]he Legislature has issued valid subpoenas" that would continue to be enforced.

¶55    The Department of Justice's citation in its April 12 letter to the Separation of Powers provision of the Montana Constitution was ironic, given that the citation was offered as justification for the Legislature's improper intrusion upon "the exercise of power properly belonging to" the Judiciary. Mont. Const. art. III, § 1. It falls within the Judiciary's power, not the Legislature's, to resolve "litigation challenging the constitutional authority of one of the three branches." *Driscoll v. Stapleton*, 2020 MT 247, ¶ 11 n. 3, 401 Mont. 405, 473 P.3d 386 (quoting *Zivotofsky v. Clinton*, 566 U.S. 189, 196, 132 S. Ct. 1421, 1428 (2012)). The April 11, 2021 Temporary Order, with which the Legislature and Department of

Justice refused to comply, addressed such a constitutional issue. *See Temporary Order*, p. 2, April 11, 2021, OP 21-0125 (stating that "McLaughlin argues that the subpoena exceeds the scope of legislative authority, violating the separation of powers . . . ."). The Separation of Powers provision is not a grant of power, but a limitation upon power, specifically, upon the inappropriate exercise of power by a branch beyond that respectively granted under Articles V, VI, and VII of the Montana Constitution. *See* Larry M. Elison & Fritz Snyder, *The Montana State Constitution: A Reference Guide* 89-90 (2001) (stating that "[p]ower granted to one branch of government cannot be exercised by another" and collecting cases, including those addressing legislative "intrusions on judicial powers.").

¶56     The surprising thing about the Department of Justice's letters was the ignorance of history and long-established legal precedent they embodied, because, since the early 1800s, "the idea that the Supreme Court had the power to pass upon constitutional questions and that its decisions were final and binding upon the other two departments of government ha[s] been . . . widely accepted." Alfred H. Kelly & Winfred A. Harbison, *The American Constitution: Its Origins and Development* 317 (5th ed. 1976). Although *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803) (providing that "[i]t is emphatically the province and duty of the judicial department to say what the law is") is commonly and correctly cited as the source ruling concerning this judicial authority, *see Driscoll*, ¶ 11 n.3, the principle precedes *Marbury* in our constitutional history. The Judiciary's power to judge the legality of the actions of the other two branches or "departments" was a precept publicly advanced to the country's citizens as explanatory of the system of government

27

contemplated under the proposed Constitution, and in support of its adoption.  As explained

by Alexander Hamilton in 1788, prior to the adoption of the Constitution:

> the courts were designed to be an intermediate body between the people and the legislature, in order, among other things, *to keep the latter within the limits assigned to their authority*.  The interpretation of the laws is the proper and peculiar province of the courts.  A constitution is, in fact, and must be regarded by the judges, as a fundamental law.  It must therefore belong to them to ascertain its meaning, *as well as the meaning of any particular act proceeding from the legislative body*.

*The Federalist* No. 78, 498 (Robert Scigliano ed., Random House, Inc. 2000) (emphasis

added).[1, 2]

¶57    The reason for conferring this weighty power upon an independent judiciary was,

simply but significantly, to protect liberty.   "[L]iberty of the people can never be

endangered" by the courts of justice, Hamilton explained, "so long as the judiciary remains

---

[1] It is notable that Hamilton was the "big government" proponent of his day, advocating for a strong central government with broadly construed powers.  *See* Kelly & Harbison, *supra*, at 169 (stating that "Hamilton presented what was to become the classic exposition of the doctrine of the broad construction of federal powers under the Constitution.").  Nevertheless, he urged that the judiciary should have the final say about the validity of actions taken by the other branches of government.

[2] The Federalist Papers are frequently cited as constitutional authority by the U.S. Supreme Court. *See Trump v. Mazars USA, LLP*, ___ U.S. ___, 140 S. Ct. 2019 (2020); *Allen v. Cooper*, ___ U.S. ___, 140 S. Ct. 994 (2020); *Murphy v. National Collegiate Athletic Ass'n*, ___ U.S. ___, 138 S. Ct. 1461 (2018); *National Labor Relations Bd. v. SW Gen., Inc.*, ___ U.S. ___, 137 S. Ct. 929 (2017); *Pena-Rodriguez v. Colorado*, ___ U.S. ___, 137 S. Ct. 855 (2017); *Evenwel v. Abbott*, ___ U.S. ___, 136 S. Ct. 1120 (2016); *Comptroller of the Treasury of Maryland v. Wynne*, 575 U.S. 542, 135 S. Ct. 1787 (2015); *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 135 S. Ct. 1656 (2015); *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 135 S. Ct. 1378 (2015); *National Labor Relations Bd. v. Canning*, 573 U.S. 513, 134 S. Ct. 2550 (2014); *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 134 S. Ct. 2024 (2014); and *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 133 S. Ct. 1659 (2013).

truly distinct from both the legislature and the Executive." Hamilton, *supra*, at 497.

Hamilton made this point regarding both other branches, but particularly regarding the

legislative branch:

> "there is no liberty, if the power of judging be not separated from the legislative and executive powers." It proves, in the last place, that as liberty can have nothing to fear from the judiciary alone, but would have everything to fear from its union with either of the other two departments . . . .
>
> The complete independence of the courts of justice is peculiarly essential in a limited Constitution. *By a limited Constitution, I understand one which contains certain specified exceptions to the legislative authority*; such, for instance, as that it shall pass no bills of attainder, no ex-post-facto laws, and the like. *Limitations of this kind can be preserved in practice no other way than through the medium of the courts of justice, whose duty it must be to declare all acts contrary to the manifest tenor of the Constitution void.* Without this, all the reservations of particular rights or privileges would amount to nothing.

Hamilton, *supra* at 497 (emphasis added).

¶58     However, as Hamilton further explained, the Judiciary has only "judgment" to offer,

that is, the Judiciary is provided no mechanism to enforce its own decrees, and thus, the

Judiciary "must ultimately depend upon the aid of the executive arm for the efficacious

exercise" of its power. Hamilton, *supra*, at 496. This reality is what makes the Attorney

General's defiance of the Court's orders in this case so disruptive of our constitutional

system—the Judicial branch often must rely upon the Executive branch for execution of its

orders and conveyance of the "judgment" the Judiciary has been constitutionally

empowered to provide. By repeatedly refusing to comply, the Attorney General engages

in actions that are destructive to our democratic system of government. "[T]he executive

is as much bound to recognize the Court's decision as any other individual; otherwise the

very judicial capacity of the Court itself is virtually destroyed." Kelly & Harbison, *supra*, at 318. Unfortunately, the Attorney General is not the first to choose this dark pathway.

¶59 President Andrew Jackson famously declared, in response to the U.S. Supreme Court's decision in *Worcester v. Georgia*, 31 U.S. (6 Peters) 515 (1832), with which he strongly disagreed, "John Marshall has made his decision, now let him enforce it." Kelly & Harbison, *supra*, at 287. So accepted in 1832 was the principle of the Court's power of judicial review and the binding nature of its decisions upon the other branches of government, that leading statesmen of the day, including Henry Clay and Daniel Webster, attacked Jackson's stand as subversive to our constitutional democracy and a violation of "first principles." Kelly & Harbison, *supra*, at 317. But Jackson refused to relent, asserting, "[t]he Congress, the Executive, and the Court must each for itself be guided by its own opinion of the Constitution"—the same position taken by the Department of Justice in its letters of April 12 and April 18. Kelly & Harbison, *supra*, at 317. The results of Jackson's extraconstitutional stand were calamitous.

¶60 In *Worcester*, laws passed by the State of Georgia purporting to govern the lands of the Cherokee Nation of Georgia—attractive lands within the western region of Georgia desired by governing authorities and citizens alike—were challenged as being unconstitutional. The Supreme Court struck down Georgia's laws, declaring the Cherokee Nation was sovereign and that it occupied its own territory "in which the laws of Georgia can have no force, and which the citizens of Georgia have no right to enter, but with the assent of the Cherokees themselves, or in conformity with treaties, and with the acts of congress." *Worcester*, 31 U.S. (6 Peters) at 561. The Court explained that Georgia's laws

30

interfere forcibly with the relations established between the United States and the Cherokee nation, the regulation of which, according to the settled principles of our constitution, are committed exclusively to the government of the union.

They are in direct hostility with treaties, repeated in a succession of years, which mark out the boundary that separates the Cherokee country from Georgia; guaranty to them all the land within their boundary; solemnly pledge the faith of the United States to restrain their citizens from trespassing on it; and recognize the pre-existing power of the nation to govern itself.

They are in equal hostility with the acts of congress for regulating this intercourse, and giving effect to the treaties.

*Worcester*, 31 U.S. (6 Peters) at 561-62.

¶61 However, despite the Supreme Court's clear directives that Georgia's law violated federal law and treaties, and that the national government was duty bound to defend against this encroachment upon the Cherokees' land, Jackson refused to honor the decision. Led by his usurpation, the Court's decision was openly flouted, and defiance was popularly applauded. While the decision, if enforced, would have protected the Cherokees and strengthened their efforts to resist the pressure of land-hungry encroachers, Jackson ensured that it was not, instead permitting Georgia to continue its efforts and insisting upon relocation of the Cherokees under the Indian Removal Act of 1830, 21-148 Stat. 411, by which Indian tribes who "surrendered" their ancestral homelands were granted land in the western United States. Thus, the Cherokees were forced into the Treaty of New Echota, *see* 2 Charles J. Kappler, *Indian Affairs Laws and Treaties* 439-49 (2d ed. 1904), which took their Georgia lands and subjected them to immediate forcible relocation to Oklahoma by the U.S. Army, a brutal journey in which thousands of Cherokees lost their lives, and which has become known to history as The Trail of Tears. This tragic suffering was rooted

31

in the arrogance of one man demanding to have his own way, Constitution be damned. While the tears of human suffering fell directly at the feet of Andrew Jackson, what is important for us today is this: "[t]hose who fail to learn from history are condemned to repeat it."[3] And we have seen history repeated in the Attorney General's extralegal actions taken in this case.

¶62 Of course, under our constitutional system of government, there are legally permissible responses to a court decision one disagrees with. The law is a vast body of knowledge, about which there can be fair disagreement over its correct application in a particular case. When judges disagree about the law's application, they publicly state their disagreement and provide the legal reasoning therefor. For interested parties, disagreement with the Court's decisions can be answered by seeking rehearing by the court in the particular case, the passage of responsive legislation, amendment of the constitution, or, in Montana, the selection of different judges during elections. Sending the Court letters in defiance of its orders is not a legally available option under the Montana Constitution.

¶63 Lastly, there is the matter of the Legislature's intervention in this matter and the subsequent statement made in its briefing. Following the letter of April 12, conveying the refusal of the Department of Justice and the Legislature to comply with the Court's Temporary Order, the Legislature, represented by other counsel, filed a motion to intervene

---

[3] Laurence Geller CBE, Churchill's Shakespeare, at the Folger Library, Washington D.C. (transcript at https://perma.cc/X94L-V55G) (citing a 1948 address to the House of Commons by Winston Churchill, paraphrasing philosopher George Santayana).

in this matter. To obtain opposing counsel's consent to its intervention, the Legislature committed "to abide by and comply with all orders of the Court." *See Order*, p. 2, April 14, 2021, OP 21-0125. Based expressly upon that commitment, this Court exercised its discretion to grant the Legislature's motion to intervene.

¶64 However, after obtaining intervention, the Legislature reneged on its commitment, stating in its filing that what it *really* meant by its promise to comply with "all orders" of the Court was merely "to abide by orders *that the Court has proper jurisdiction to issue*"— apparently as that would be subjectively determined by someone other than this Court, perhaps by the Legislature itself or by the Department of Justice. *Montana State Legislature's Summary Response to Petition*, p. 1, n.1, April 14, 2021, OP 21-0125 (emphasis added). The Legislature thus clearly demonstrated it had gained intervention into this proceeding by misrepresenting its position to this Court, and to opposing counsel as well. These actions were dishonest and contemptuous. Perhaps individual legislators active in this matter had no knowledge that these actions were taken on their behalf, or on the Legislature's behalf. However, the Legislature's intervention counsel, who are experienced advocates, surely knew. And they know better than to engage in such duplicitous actions.

¶65 The rightful consequence of these actions would be to revoke the Legislature's intervention, strike its brief, and to view with caution any future requests made of this Court by the Legislature. Similar sanctions would likewise be appropriately imposed upon the Department of Justice for its contemptuous actions herein. My initial thought was to ask the Court to impose these sanctions, but a second thought prevailed: until the Legislature

33

and the Department of Justice can demonstrate a proper understanding of the Judiciary's constitutional authority, there is little hope they could comprehend contempt of it.

¶66    I concur.


/S/ JIM RICE


Justice Laurie McKinnon, dissenting.

¶67    I dissent from the Court's decision that SB 140 is constitutional.

¶68    Before addressing the construction of the constitutional provision at issue and the particulars of the Framers' intent, some preliminary observations for purposes of context are warranted.  Article VII, Section 8(2) must be considered in its entirety and consistent with the intent of the Framers.  While "in the manner provided by law" gives the Legislature discretion to develop a selection process for interim vacancies, that discretion must be exercised consistent with the constitutional provision as a whole, and with the intent of the Framers to provide a merit selection process for interim vacancies.  The merit selection process unanimously agreed upon for interim vacancies was part of a larger conversation amongst the Framers about whether, in general, judges should be elected—the prevailing and majority proposal—or selected based upon merit—the minority proposal known as the "Missouri Plan."  While proponents of the merit process lost the war respecting judicial selection as a whole, they won the battle for interim vacancies.  However, it is important to place the Framers' debate in proper context.  Because of Montana's biennial election cycle, it was *impossible* to fill an interim vacancy by election,

34

the preferred method. As the Framers were united in their position that placing power in the governor to make judicial appointments posed a threat to the independence of Montana's judiciary, a selection process based on merit, the only reasonable type of vetting process, was the best solution short of an election. As they developed the judiciary article, the Framers repeatedly referred to Montana's history of big business, political corruption, outside influences, and control of Montana's courts by the executive branch.[1] They were united in their conviction that the judiciary must be independent and protected from executive overreach. While the Framers unanimously agreed that a merit selection process was preferable to direct gubernatorial appointments, they likewise understood that commissions were also subject to political influences. *See* Montana Constitutional Convention, Verbatim Transcript, February 26, 1972, Vol. IV, p. 1027 (". . . you cannot pick a committee in the State of Montana that will be totally free of that kind of influence."). While leaving employment of the merit selection process in the Legislature's hands, the Framers' intent was clear that the nominees from whom the governor could appoint would be vetted based on merit—the only way to protect against a direct gubernatorial appointment. Unfortunately, fifty years after the 1972 Constitutional Convention, this Court reaches a conclusion contrary to the Framers' intent and which enables what the Framers clearly sought to prevent—a direct gubernatorial appointment.

---

[1] "With statehood, Montana's judiciary transitioned from federal appointees unfamiliar with mining law to elected officials all too familiar with the corporate overreach and corruption that came to be known as the War of the Copper Kings." *A Past and Future of Judicial Elections: The Case of Montana*, Anthony Johnstone, 16 J. App. Prac. & Process 47, 53 (2015).

SB 140 is not a merit based nomination process and does nothing to prevent direct appointments by the governor—and the Court should call it for what it is. It quite simply allows the governor to make a direct appointment from self-nominated applicants.

¶69　Turning now to rules of construction and the constitutional provision itself, we apply the same rules used in construing statutes as we do when construing a constitutional provision. *Nelson*, ¶ 14. "As with statutory interpretation, constitutional construction should not lead to absurd results, if reasonable construction will avoid it." *Nelson*, ¶ 16 (internal citations omitted). We must look to the entire provision and attempt to give effect to each word contained therein and construe the provision consistently. Section 1-2-101, MCA. Article VII, Section 8(2) provides: "[T]he governor shall appoint a replacement from *nominees selected* in the manner provided by law" (emphasis added). The plain language of this provision requires that "nominees"[2] be "selected" by a process provided by the Legislature. It is clear the Legislature's discretion is not unbridled, rather it is limited by the requirement that there be both a *selection* process and that applicants become *nominees*. The plain language does not permit the governor to consider an entire pool of applicants, as there would not be a "selection" of "nominees" as required by the words or plain language of this constitutional provision. Accordingly, "nominees selected" provides a limitation on the Legislature's discretion when it exercises its authority to make laws.

---

[2] "Nominee" is defined as, "Someone who is proposed for an office, membership, award, or like title or status. An individual seeking nomination, election, or appointment is a *candidate*. A candidate for election becomes a *nominee* after being formally nominated." *Nominee, Black's Law Dictionary* (11th ed. 2019) (emphasis in original).

SB 140 violates the plain language of Article VII, Section 8(2) because it merely establishes an application process, not a selection process for nominees *from* which the governor may appoint. There is no selection of nominees if the governor can consider the entire pool of self-nominating applicants. The requirement that an applicant have three letters from an adult Montana resident does not establish a manner for selecting nominees; it merely establishes an additional requirement for the application, which is customary for any job application process. The entire impetus for changing the judiciary article in the 1972 Constitutional Convention was to replace the governor's sole discretion to fill vacancies set forth in the 1889 Constitution with a system that provided a list of qualified nominees derived through an independent vetting process. To conclude, as the Court does, that these three letters satisfy the constitutional requirement that the governor appoint from "nominees selected," is akin to saying the Emperor is wearing new clothes when the Emperor is not and, as noted by a young boy, the Emperor is really naked.[3]

¶70     While the plain language of the constitutional provision restricts the discretion of the Legislature as described, the intent of the Framers *controls* the Court's interpretation of a constitutional provision. *Nelson*, ¶ 14. "Even in the context of clear and unambiguous language, however, we have long held that we must determine constitutional intent not only from the plain meaning of the language used, but also in light of the historical and surrounding circumstances under which the Framers drafted the Constitution, the nature of the subject matter they faced, and the objective they sought to achieve." *Nelson*, ¶ 14.

---

[3] "The Emperor's New Clothes," Hans Christian Andersen, *Fairy Tales Told for Children* (1837).

Moreover, "[i]n determining the meaning of the constitution, the Court must keep in mind that it is not the beginning of law for the state, but a constitution assumes the existence of a well understood system of law which is still to remain in force and to be administered, but under constitutional limitation." *Nelson*, ¶ 15 (quoting *Grossman v. Mont. Dep't of Natural Res.*, 209 Mont. 427, 451-52, 682 P.2d 1319, 1332). The constitution refers to many terms and concepts that it does not define. *Nelson*, ¶ 15 (quoting *State ex rel. Hillis v. Sullivan*, 48 Mont. 320, 326, 137 P. 392, 394). The Court examines these concepts in the context of the "'previous history' of this community [and] 'the well-understood system' then in use." *Nelson*, ¶ 15 (quoting *Hillis*, 48 Mont. at 326, 137 P. at 394).

¶71 To provide context to the Framers' intent when drafting the 1972 judiciary article, it is necessary to trace the development of Montana's judiciary article. As a territory, Montana judges were appointed by the President in Washington D.C. While likely learned and capable jurists, they had federal connections and harbored eastern values. They were unfamiliar with the lives, struggles, and ambitions of the territory's inhabitants. More particularly, they were unfamiliar with mining law and mining interests, which was fast becoming a lucrative business at the "richest hill on earth" in Butte. In Montana's first attempt at a constitution in 1884, Montanans responded to these outside influences by providing that justices of the Supreme Court would be "elected by the people" for a six-year term and would be required to live in the Territory for two years. The provision for judicial selection by election and the residency requirement were a response to the grievances Montanans held against foreign judges appointed by the executive.

38

¶72 The proposed 1884 Constitution failed to be ratified and it was not until the 1889 Constitution that Montana acquired statehood and had a judiciary article within its own constitution. The 1889 Constitution remained committed to the election of Montana judges "by the people" and retained the residency requirement. Significant here, the 1889 Constitution provided that in the case of vacancy in the position of Justice of the Supreme Court, the district court, or the clerk of the Supreme Court, the position "shall be filled by appointment, by the governor of the State." Mont. Const. art. VIII, § 34 (1889). Soon after ratification, the wealthy corporate mining interests exerted their influence over government and also threatened the independence of the courts. These corporations were owned by outside stakeholders and benefitted their foreign interests, even though Montana citizens were the ones who worked and died in Butte's mines. Montana's rich resources would always subject Montanans to the needs and demands of large corporations owned, dominated, and run by outside interests, in part because of the extensive amount of capital needed to mine, explore, and develop these resources. Soon these mining interests began a campaign to control state government, including its judiciary, and often advanced agendas inconsistent with the interests of local Montana farmers, ranchers, miners, and the working class. *See Patrick v. State*, 2011 MT 169, 361 Mont. 204, 257 P.3d 365. The "Copper King" era, as it has been called, and Montana's long history of political corruption, overreach by the branches of government, and control of its government institutions by outside influences plays a significant role in the development of Montana's judiciary. In my opinion, those influences continue to be exerted on the judiciary today and threaten the judiciary's independence.

¶73 The 1965 reapportionment of the State Legislature created the 1967 Legislature, which commissioned a study to ascertain whether the 1889 Constitution was adequately serving the needs of the people. Voters responded and, in a 1970 referendum, elected to convene the 1972 Constitutional Convention. This remarkable event in Montana's history would again bring under scrutiny Montana's judiciary article and, in particular, how judges are selected. As Delegate Jim Garlington explained, "There is clear agreement on the part of all that we do need good judges . . . . The question is how to recruit them." Montana Constitutional Convention, Verbatim Transcript, February 26, 1972, Vol. IV, p. 1032. Delegate Cedor Aronow spoke of the importance of an independent judiciary:

> [I]t is dreadfully important . . . that the courts be made independent, be made strong, be made unafraid to act for fear of reprisal from one of the other branches of the government. And it is only in that manner that we can guarantee to our people the liberties that we wish them to have.
>
> The court should also be made strong enough and independent enough that they have no fear of striking down an unconstitutional legislative act. They should have no fear of saying to the Executive branch of government, "You've gone too far; you've impugned upon the rights of individuals."

Montana Constitutional Convention, Verbatim Transcript, February 26, 1972, Vol. IV, pp. 1069-70. Montana's history of political corruption and overreach of the judiciary was aptly described by Delegate John Schiltz,

> As I say, it's not a good system as we have it, but I submit to you that in this State of Montana, where we have different problems from the problems they have in Missouri or any other state; where we have strong corporate influences; where, if I can elect a Governor and, through that office, nominate and appoint the district and the Supreme Court judges, I can run this state. *I can own it*.

40

Montana Constitutional Convention, Verbatim Transcript, February 26, 1972, Vol. IV, p. 1026 (emphasis added). This history provides important context to the 1972 Constitutional Convention when, ultimately, the Framers decided to change the 1889 Constitution by removing the appointment power of the governor in the case of judicial interim vacancies.

¶74    At the 1972 Constitutional Convention, the Framers debated whether Montana judges should be popularly elected or selected under a merit based process known as the Missouri Plan. The majority proposal, which supported election of judges, provided that interim vacancies of the Supreme Court would be filled by the governor and district court vacancies would be filled by the county commissioners within the judicial district. However, the minority was dissatisfied by the unlimited gubernatorial appointive power of judges and proposed limiting the governor's power to appointing from nominees selected by a committee, created by and dependent upon the Legislature. It was believed such a system would afford an effective check and balance. The minority plan also envisioned creating a vetting committee. "The object here was to insure as nearly as possible that this committee will not be dominated by one party to the other. Likewise, we were concerned about this committee being dominated by some vested interest . . . ." Montana Constitutional Convention, Verbatim Transcript, February 26, 1972, Vol. IV, p. 1023.

¶75    In the end, the Framers unanimously agreed to change the 1889 Constitution and limit the governor's appointment power by requiring the governor to appoint "from" "nominees" who were "selected." The Framers, however, left the details of the nomination selection process to the Legislature, expressing concern that there needed to be flexibility

41

to address changing circumstances. There was still distrust among some of the Framers that partisan interests would control a committee or commission. However, there is little doubt that all delegates understood that the proposal for selection of interim judges envisioned a commission or committee which would "select" and "nominate" individuals to be considered by the governor for appointment. *See, e.g.*, Montana Constitutional Convention, Verbatim Transcript, February 26, 1972, Vol. IV, p. 1090 (Hanson, expressing concern that a committee could be fair and free of outside influences); Montana Constitutional Convention, Verbatim Transcript, February 26, 1972, Vol. IV, pp. 1090-91 (Holland: "How can we guarantee that this commission—the ones that name the candidates—won't be dominated by some special interest group?"); Montana Constitutional Convention, Verbatim Transcript, February 26, 1972, Vol. IV, p. 1093 (Davis: "You can say what you want, any select committee's going to be a committee of the establishment. There's just no other way to get around it . . . ,"); Montana Constitutional Convention, Verbatim Transcript, February 26, 1972, Vol. IV, p. 1094 (Berg: "I suggest to you that that committee, committing two to three or four names to the governor, is going to get the governor a fairly wide selection of nominees, and he can select . . . whom he wants—from that committee."); Montana Constitutional Convention, Verbatim Transcript, February 26, 1972, Vol. IV, p. 1096 (McKeon: "I'm afraid, Mr. Chairman, that any committee, whether it be select, blue ribbon or whatnot, will not be a committee whose interests are the interests of the people . . . ."); Montana Constitutional Convention, Verbatim Transcript, February 26, 1972, Vol. IV, p. 1104 (Joyce: "[N]o matter how astute or how brilliant or how able or how fairly the Legislative Assembly may set up a

42

commission to select these nominees, you cannot take the human element out of the situation."). Nonetheless, the foremost concern amongst the delegates was to avoid a system in which one branch of government would attain more power than another. In his opening statements, Delegate Holland indicated that, "When you have a constitutional provision, the reservoir of powers are with the people and, naturally, to have a functioning society, you're going to have to give some powers to the Legislature and some to the court and some to the Executive. But you only want to give them so much power as you need to function . . . ." Montana Constitutional Convention, Verbatim Transcript, February 26, 1972, Vol. IV, p. 1011.

¶76 The result of the 1972 Constitutional Convention was a revised judiciary article that continued to provide for the election of judges as in the 1889 Constitution, but rejected the 1889 Constitution's provision allowing for the governor to make direct appointments for interim vacancies. Although the process for selecting nominees was not written into the 1972 Constitution and was left to the discretion of the Legislature, there is little doubt that the intent of the Framers was to eliminate the direct appointment power of the governor and provide a selection process based upon merit. In 1973, the Legislature responded and created the Judicial Nomination Commission and established a nonpartisan process to select nominees from which the governor could make an appointment. "Not satisfied with the current process of unlimited gubernatorial appointive power of judges," those who favored the minority report suggested a committee that was "bi-partisan in nature." *See A Past and Future of Judicial Elections: The Case of Montana*, Anthony Johnstone, 16 J. App. Prac. & Process 47, 72. Still there was concern about the governor having the power

43

to appoint a majority of the nominating commission. *See A Past and Future of Judicial Elections: The Case of Montana*, Anthony Johnstone, 16 J. App. Prac. & Process 47, 73 ("'the Legislature tossed the mechanics of the appointment of judges right into the political kettle' by giving the governor the power to appoint the majority of the nominating commission.").

¶77 This Court held in *Keller v. Smith*, 170 Mont. 399, 553 P.2d 1002, 1007 (1976), that "[p]erhaps the best indication of the intent of the framers is found in the explanatory notes as prepared by the Constitutional Convention." The Convention Notes "express[ ] the intent of the delegates to the Constitutional Convention and the meaning they attached to the new constitution they formed and adopted." *Keller*, 170 Mont. at 406, 553 P.2d at 1007. Here, the Voter Information Pamphlet for the 1972 Constitution, provided:

> When there is a vacancy (such as death or resignation) the governor appoints a replacement but does not have unlimited choice of lawyers as under the 1889 constitution. He must choose his appointee from a list of nominees and the appointment must be confirmed by the senate—a new requirement.

This confirms the Framers' intent that the new provision would no longer allow the governor to have plenary power to fill a vacancy; rather, the governor would make an appointment from "nominees" who were "selected" by an independent process determined by the Legislature. The Convention notes confirm the Framers intended to change the 1889 Constitution to remove authority from the governor to make direct appointments and to provide a process for vetting applicants—a process that can only reasonably be based on merit and qualifications.

44

¶78 Constitutional intent was again expressed in 1992 when Article VII, Section 8 was modified by voter initiative. The 1992 Voter Information Pamphlet stated: "The governor is limited to appointments from a list recommended by a Judicial Nominating Committee which is required by the Constitution, and whose membership and rules are established by the legislature." Appointments of justices had increased since 1972 and "commentators described 'justices who resigned before completion of a term so that a politically allied governor could appoint a replacement,' and others who 'endured under personally adverse conditions to prevent a replacement being appointed by an unfriendly governor.'" *A Past and Future of Judicial Elections: The Case of Montana*, Anthony Johnstone, 16 J. App. Prac. & Process 47, 76. The 1992 Voter Information Pamphlet on Constitutional Amendment 22 harkened back to the concern of the 1972 Framers. Proponents and opponents indicated:

> Proponents: This amendment seeks to bolster the constitution in guaranteeing the right of all Montanans to vote and participate in electoral system while maintaining the balance of powers between the three branches of government by eliminating the potential for improper use of the appointment process.

> Opponents: Safeguards addressing proponent concerns are already in place. The Governor is limited to appointments from a list recommended by a Judicial Nominating Committee which is required by the Constitution, and whose membership and rules are established by the legislature.

This Court recognized the significance of voter information pamphlets as an expression of the meaning of a constitutional provision in *State ex rel. Mont. Citizens for the Preservation of Citizens' Rights v. Waltermire*, 227 Mont. 85, 89-90, 738 P.2d 1255, 1257-58 (1987).

¶79 This Court in *Keller* also held that legislative determinations are indicative of constitutional intent. Immediately following ratification of the 1972 Constitution, the

45

Montana Legislature convened in 1973 and enacted legislation, SB 28, to implement Article VII, Section 8, respecting interim vacancies. It established the Judicial Nomination Commission to vet and select nominees for appointment by the governor for interim vacancies. This legislation, which was so temporally close to the Constitutional Convention, is very enlightening as to the Framers' intent. The commission established in 1973 had been in effect for nearly fifty years.

¶80 Finally, this Court, in *State ex rel. Racicot v. District Court*, 243 Mont. 379, 387, 794 P.2d 1180, 1185 (1990), has already expressed what the constitutional intent was of Article VII, Section 8(2):

> The minority proposal [ultimately adopted by the Framers] provided for the selection of justices and judges through a system of appointment. The Judicial Nominating Committee would review the records of candidates and present the governor with a list of the most qualified nominees. From the list, the governor would select a nominee to be confirmed or rejected by the Senate. A confirmed appointee could face a contested election in the first primary following Senate approval. Thereafter, the appointee would run in an approval-or-rejection contest in a general election for each succeeding . . . . The delegates were informed that the appointment method of systematically screening judicial candidates "is more conducive to attaining a qualified, capable judiciary than the elective method whereby candidates are chosen more for political appeal than merit." (quoting Mont. Constitutional Convention Comm'n., Mont. Constitutional Convention Study No. 14: The Judiciary, at 141).

Accordingly, this Court recognized that the Framers' intent underlying the new provision was to establish a screening process for attaining qualified judges.

¶81 Given the well-established and recognized requirement that the intent of the Framers is controlling, *Nelson*, ¶ 14, I cannot ignore rules of construction for interpreting that intent: the Convention notes; the 1973 and 1992 Voter Information Pamphlets; temporally close

legislative determinations of intent such as SB 28; our precedent interpreting the Framers' intent; and the debate that occurred amongst the Framers in 1972. While the Framers did not require that a *commission* be the method for selecting applicants and acknowledged that commissions were equally susceptible to partisan control, it is clear the Legislature was to exercise its discretion to implement a screening process based upon merit to provide qualified nominees to the governor for appointment.

¶82　Instead of applying well-established rules of construction to ascertain legislative intent, the Court relies primarily on Delegate Joyce's comments during the Constitutional Convention to suggest that control of judicial appointments by the executive branch remained a viable option considered by the Framers. However, Delegate Joyce's suggestion that the governor have direct appointment power was rejected by the Framers out of concern for maintaining the separation of power and placing too much power in the executive branch of government. And, ultimately, even Delegate Joyce changed his mind as the vote for the new constitutional provision was 88 in favor, and 0 against. Moreover, in *Keller*, this Court cautioned against selective use of excerpts from the transcripts:

> We remark in passing that we have not relied on the minutes of the Constitutional Convention proceedings as indicative of the intent of the delegates. We have purposely refrained from using this basis of interpretation as excerpts from various portions of the minutes, among other things, can be used to support either position, or even a third position . . . .

*Keller*, 170 Mont. at 408-9, 553 P.2d at 1008. Instead, the Court in *Keller* relied on rules of construction to ascertain the delegates' intent such as the Voter Information Pamphlets (Convention notes), legislative determination of intent, and precedent.

47

¶83    The Court equates the public comment period of SB 140 to a vetting process which presumably will expose unqualified candidates.  Opinion, ¶ 45.  However, while public comment satisfies Montana's constitutional right to know and participate in government, I fail to see how either a public comment period or three letters of reference are a screening process, as contemplated by the Framers, to obtain qualified judicial nominees for appointment by the governor.  More importantly, the ability of the public to comment on an applicant does not convert SB 140 into a screening process based on merit and does little to advance the Framers' intent to change the 1889 Constitution and limit the governor's appointment power to appoint "from" "nominees" who are "selected."

¶84    In my opinion, by giving the governor plenary power to select judges, SB 140 poses precisely the threat to the independence of Montana's judiciary that Montana has historically been burdened with and that the 1972 Framers sought to prevent.  This Court's failure to call SB 140 for what it is gives a green light to a partisan branch of government to select judges who are charged with the responsibility of providing a check on that power. While perhaps this design exists in other states and federally, the 1972 Framers did not want it to exist in Montana.  Obviously, this Court will have to consider the constitutionality of statutes enacted by the Legislature and signed into law by the governor. Principals of separation of power and our constitutional design provide that the necessary check on partisan power and overreach is through an independent and nonpartisan judiciary.  The Court's decision today weakens that balance.  There is little question in my mind that the Framers, burdened with a history of political corruption and overreach and committed to a qualified and independent judiciary, were united in their conviction that the

48

governor should no longer have plenary authority to make a direct appointment, as in the 1889 Constitution.[4] Foremost on the Framers' minds was an independent judiciary and ensuring that power was not disproportionately placed in one branch of government. In my opinion, SB 140 is inconsistent with the plain language of Article VII, Section 8, and what was at the core of the Framers' convictions—to preserve the integrity and independence of Montana's judiciary in light of our significant history of political corruption and overreach into the courts.

¶85    I respectfully dissent.


/S/ LAURIE McKINNON

---

[4] "Montana's answer reflects a territorial suspicion of outside influence, a progressive-era concern about corporate corruption, and an extraordinary deep deliberation among ordinary citizens about competing models for judicial selection in the formation of its 1972 constitution." *A Past and Future of Judicial Elections: The Case of Montana*, Anthony Johnstone, 16 J. App. Prac. & Process 47, 130.