**FILED**

08/12/2022

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 22-0229

DA 22-0229

IN THE SUPREME COURT OF THE STATE OF MONTANA

2022 MT 160

SISTER MARY JO MCDONALD; LORI
MALONEY; FRITZ DAILY; BOB BROWN;
DOROTHY BRADLEY; VERNON FINLEY;
MAE NAN ELLINGSON; and the LEAGUE
OF WOMEN VOTERS OF MONTANA,

      Plaintiffs and Appellees,

v.

CHRISTI JACOBSEN, Montana Secretary of State,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Second Judicial District,
In and For the County of Butte-Silver Bow, Cause No. DV-2021-120
Honorable Peter B. Ohman, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Austin Knudsen, Montana Attorney General, David M.S. Dewhirst, Solicitor General, Christian B. Corrigan, Assistant Solicitor General, Timothy Longfield, Assistant Attorney General, Helena, Montana

      For Appellees:

            James H. Goetz, Goetz, Geddes & Gardner, P.C., Bozeman, Montana

            A. Clifford Edwards, Edwards & Culver, Billings, Montana

            Submitted on Briefs:  July 20, 2022
                       Decided:  August 12, 2022

Filed:

_____
               Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1 Christi Jacobsen, in her official capacity as Montana Secretary of State (Secretary), appeals the March 21, 2022 Second Judicial District Court Order ruling in favor of Sister Mary Jo McDonald, Lori Maloney, Fritz Daily, Bob Brown, Dorothy Bradley, Vernon Finley, Mae Nan Ellingson, and the League of Women Voters of Montana (collectively, Plaintiffs) on cross-motions for summary judgment and enjoining the Secretary from placing House Bill (HB) 325 on Montana's 2022 general election ballot. We affirm.

¶2 We restate the issues on appeal as follows:

*Issue One: Is the question of the constitutionality of the referendum proposed by HB 325 ripe for judicial resolution?*

*Issue Two: Does the referendum proposal—which requires that Supreme Court justices be elected district-by-district, rather than statewide—violate the Montana Constitution?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 During the 2021 Legislative Session, the Legislature passed HB 325, a legislative referendum to submit a proposal to Montana voters on the November 2022 general election ballot. *See* 2021 Mont. Laws ch. 402, § 1. If approved, the measure will establish seven Supreme Court districts in Montana, assign each Supreme Court seat to one of the seven districts, and require candidates for each seat to run for election solely within the district assigned to that seat. It would also require the chief justice to be chosen by the majority vote of the seven justices after the 2024 general election.

¶4 Plaintiffs filed the present challenge to the constitutionality of HB 325 in the Second Judicial District. The District Court—relying on our ruling on a similar legislative

2

referendum in *Reichert v. State, ex. rel McCulloch*, 2012 MT 111, 365 Mont. 92, 278 P.3d 455—granted summary judgment to the Plaintiffs, and enjoined the Secretary from placing HB 325 on the November 2022 ballot. The Secretary appeals, contending that the constitutionality of HB 325 is not ripe for judicial review and, alternatively, that HB 325's provisions are not unconstitutional.[1]

## STANDARD OF REVIEW

¶5 This Court reviews the grant of summary judgment de novo, determining whether the District Court's conclusions of law were correct. *Styren Farms, Inc. v. Roos*, 2011 MT 299, ¶ 10, 363 Mont. 41, 265 P.3d 1230 (citation omitted); *Kilby Butte Colony, Inc. v. State Farm Mut. Auto. Ins. Co.*, 2017 MT 246, ¶ 7, 389 Mont. 48, 403 P.3d 664 (citation omitted). Summary judgment is appropriate when the moving party demonstrates the absence of any genuine issues of material fact and entitlement to judgment as a matter of law. *Styren Farms*, ¶ 10; M. R. Civ. P. 56(c)(3).

## DISCUSSION

¶6 *Issue One: Is the question of the constitutionality of the referendum proposed by HB 325 ripe for judicial resolution?*

¶7 The Secretary first disputes the District Court's conclusion that the question of HB 325's constitutionality is presently justiciable. In particular, she argues that because the provisions of HB 325 have not yet been, and may never be, approved by the voters, the issue is not ripe for judicial resolution.

---

[1] The Secretary also filed a motion to disqualify the Chief Justice and the six Associate Justices of this Court, which this Court denied. *See McDonald v. Jacobsen*, No. DA 22-0229, Order (Mont. June 14, 2022).

¶8 The judicial power of Montana's courts is limited to "justiciable controversies." *Plan Helena, Inc. v. Helena Reg'l. Airport Auth. Bd.*, 2010 MT 26, ¶ 6, 355 Mont. 142, 226 P.3d 567; *Montana-Dakota Utils. Co. v. City of Billings*, 2003 MT 332, ¶ 9, 318 Mont. 407, 80 P.3d 1247. A justiciable controversy is one that is "definite and concrete, touching legal relations of parties having adverse legal interests" and "admitting of specific relief through decree of conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts, or upon an abstract proposition." *Chovanak v. Matthews*, 120 Mont. 520, 526, 188 P.2d 582, 585 (1948) (emphasis omitted). The constitutional component of the justiciability limitation derives primarily from the Montana Constitution, which has been interpreted to, like its federal counterpart, limit the courts to deciding only cases and controversies. *Reichert*, ¶ 53 (citing *Plan Helena*, ¶ 6; *Greater Missoula Area Fed'n. of Early Childhood Educators v. Child Start, Inc.*, 2009 MT 362, ¶ 22, 353 Mont. 201, 219 P.3d 881; *Heffernan v. Missoula City Council*, 2011 MT 91, ¶¶ 31-33, 360 Mont. 207, 255 P.3d 80). However, justiciability is also derived from self-imposed "discretionary limitations on the exercise of judicial power" on the basis of "prudential reasons." *Reichert*, ¶ 53 (citing *Plan Helena*, ¶ 6; *Child Start, Inc.*, ¶ 22; *Heffernan*, ¶¶ 31-33). While the constitutional case-or-controversy component must always be met, prudential rules may be subject to exceptions. *Reichert*, ¶ 53. Ripeness is one of a number of specific doctrines applicable to the justiciability question. It is particularly concerned with whether the case presents an actual, present controversy. *Reichert*, ¶ 54 (citing *Mont. Power Co. v. Mont. Pub. Serv. Comm'n.*, 2001 MT 102, ¶ 32, 305 Mont. 260, 26 P.3d 91; *Greater Missoula*, ¶ 23). "[C]ases are unripe when the parties

4

point only to hypothetical, speculative, or illusory disputes as opposed to actual, concrete conflicts." *Reichert*, ¶ 54 (citing *Wis. C., Ltd. v. Shannon*, 539 F.3d 751, 759 (7th Cir. 2008); *Mont. Power Co.*, ¶ 32).

¶9 Addressing, first, the constitutional component of ripeness, it is clear under our factually on-point precedent that the current dispute meets the constitutional requirement for a justiciable case or controversy. Explicitly addressing "the constitutional component of ripeness" of a challenge to a measure nearly identical to HB 325, *Reichert* found sufficiently "definite and concrete, not hypothetical or abstract" issues were presented where the plaintiffs "allege[d] a threatened injury because [the challenged measure], should it pass, will deprive them of their right to vote for each seat on the Supreme Court." *Reichert*, ¶ 58. We determined that this resulted in "a controversy in the constitutional sense." *Reichert*, ¶ 58. Plaintiffs in the present case allege the same threatened injury as that found sufficient to establish the constitutional component of justiciability in *Reichert*.[2]

¶10 The Secretary seeks to factually distinguish *Reichert* on the basis of the time-table imposed by the challenged measure in that case. The Secretary points to *Reichert's* observation that, in that case:

> [w]hile all registered voters in the state may vote in the June primary election for the candidates running for [those seats up for reelection], only registered

---

[2] Moreover, the future installment of judicial officers pursuant to an allegedly constitutionally-defective measure constitutes a threatened injury sufficient to satisfy the constitutional case-or-controversy justiciability requirement. *See Brown v. Gianforte*, 2021 MT 149, ¶¶ 15-19, 404 Mont. 269, 488 P.3d 548 (finding challenge to the constitutionality of newly-enacted law to change judicial appointment process in the future met the necessary case-or-controversy requirement because the law, if unconstitutional, would result in future judicial appointments of individuals in whom the judicial power never vests, "unlawfully wielding authority" over serious matters in the lives of Montanans and posing a sufficiently "clear threat to [the plaintiffs'] property or civil rights").

voters in the [the corresponding] Supreme Court districts, respectively, will be permitted to vote for those seats in the November general election (if [the proposed legislative referendum] is adopted).

*Reichert*, ¶ 58. She asserts that "forc[ing] a *statewide* primary election in June 2012" followed by "*district-only* elections in November" for the relevant Supreme Court seats constituted factually-distinguishable "immediate exigencies" upon which the *Reichert* Court's finding of jurisdiction rested. According to the Secretary, HB 325 is distinguishable from the measure in *Reichert* because HB 325 would not go into effect until the election cycle (2024) *after* the one in which it was voted upon (2022). However, the cited passage of *Reichert* reveals that the key element upon which the Court's justiciability analysis turned was that the plaintiffs, like those in the present case, "allege[d] a *threatened* injury because [the legislative referendum], should it pass, *will deprive them of their right to vote for each seat on the Supreme Court,*" thereby presenting issues that are sufficiently definite and concrete, rather than purely hypothetical or abstract. *See Reichert*, ¶ 58 (emphasis added). Thus, the relevant definite and concrete fact at the heart of the controversy in *Reichert* was not *when*—before, between, or after the current election cycle's primary and general elections—the challenged measure, if approved, would shrink the electorate, but simply that it *would do so*. Contrary to the Dissent's assertion, the presence of additional months between a legislative referendum's approval and its implementation does nothing to render the threatened harm any less definite and concrete or the issues at hand any more hypothetical or abstract in the constitutional sense. *See* Dissent, ¶¶ 61, 62.

6

¶11 Relatedly, the Secretary argues that an "[a]mplifying" concern in *Reichert* was whether the Court would have had sufficient time to issue an opinion on the legislative referendum before the November 2012 general election if the Court waited to hear a challenge until after the June 2012 vote approved or rejected the referendum. However, she points to nothing in *Reichert*'s majority Opinion referencing the Court's estimation of its ability to timely hear the case between the June vote and the November general elections, which would have been subject to the new measure if approved. To the contrary, *Reichert's* dissenting Opinion revealed that "[a]s illustrated by the efficiency with which this appeal was briefed, considered and decided, we easily could have held the appeal in abeyance, awaited certification of the June 5 election results, and decided the case—if necessary—within a few weeks." *Reichert*, ¶ 97 (Baker, J., dissenting).

¶12 In *MEA-MFT* we applied *Reichert* to find another pre-election challenge to a proposed legislative referendum to be justiciable in the absence of any potential temporal urgency or unusual timetables, further demonstrating that such considerations were not relevant to the constitutional justiciability inquiry. *See MEA-MFT v. McCullough*, 2012 MT 211, ¶ 18, 366 Mont. 266, 291 P.3d 1075. *MEA-MFT* found the challenge to the legislative referendum to be justiciable despite determining that the measure, if implemented, would begin to impact government activity in August of 2013, nearly a year after the Opinion was issued in September of 2012. *See MEA-MFT*, ¶ 18. *MEA-MFT* applied *Reichert* with no reference to timing difficulties and conclusively demonstrates that *Reichert* cannot be distinguished on the basis of any particular timetable under which it may have been operating.

¶13 We conclude under our factually on-point precedent, *Reichert*, that the current dispute meets the constitutional requirement for a justiciable case or controversy. Plaintiffs allege a threatened injury identical to that alleged in *Reichert*—HB 325, should it pass, will deprive them of their right to vote for each seat on the Supreme Court. The *threat* of disenfranchisement is definite and concrete, not hypothetical or abstract, because if HB 325 passes in 2022, Plaintiffs will lose their constitutional right to vote for each seat on the Supreme Court. Plaintiffs have presented a controversy in the constitutional sense. We turn now to prudential considerations for a justiciable case or controversy.

¶14 Under the Montana Constitution, "[t]he legislative power is vested in a legislature. . . . The people reserve to themselves the powers of initiative and referendum." Mont. Const., art. V § 1. "Judicial intervention in referenda or initiatives prior to an election is not encouraged." *Cobb v. State*, 278 Mont. 307, 310, 924 P.2d 268, 269 (1996). To effectively preserve and protect the rights Montanans have reserved to themselves to approve and reject by referendum legislative acts and proposed constitutional amendments, pre-election judicial review is rare. *State ex rel. Boese v. Waltermire*, 224 Mont. 230, 234, 730 P.2d 375, 378 (1986); *Harper v. Greely*, 234 Mont. 259, 267-68, 763 P.2d 650, 655-56 (1988). However, such deference and restraint does not apply where the challenged measure is facially unconstitutional. In such instances, the courts have a duty to exercise jurisdiction and declare the measure invalid. *Reichert*, ¶ 59. *See e.g. State ex rel. Steen v. Murray*, 144 Mont. 61, 69, 394 P.2d 761, 765 (1964) (enjoining the Secretary of State from placing on the ballot an initiative that was "unquestionably and palpably unconstitutional on its face"); *State ex rel. Harper v. Waltermire*, 213 Mont. 425, 428, 691 P.2d 826, 828

8

(1984) (entertaining a pre-election challenge to an initiative that, on its face, was "beyond the power of initiative granted the people by the Montana Constitution"); *cf. Cobb*, 278 Mont. at 311, 924 P.2d at 270 (affirming an injunction that prohibited the Secretary of State from placing on the ballot a referendum which, if enacted, would leave "an obvious defect in the constitution").[3] We explained that placing a facially defective measure on the ballot "does nothing to protect voters' rights" and places an unwarranted burden on the public by "putting voters to the task of deciding a ballot issue" and "conveying the false appearance that a vote on the measure counts for something, when in fact the measure is invalid regardless of how the electors vote," thereby constituting a senseless "waste of time and money for all involved." *Reichert*, ¶ 59.[4]

---

[3] *See also Sawyer Stores, Inc. v. Mitchell*, 103 Mont. 148, 62 P.2d 342 (1936) (enjoining initiative vote where form of the ballot was defective); *Burgan & Walker, Inc. v. State*, 114 Mont. 459, 137 P. 663 (1943) (enjoining legislative referendum where the measure was unconstitutional); *Montana Citizens for the Preservation of Citizens' Rights v. Waltermire*, 224 Mont. 273, 729 P.2d 1283 (1986) (allowing vote on initiative to proceed); *Nicholson v. Cooney*, 265 Mont. 406, 877 P.2d 486 (1994) (allowing vote on referendum after finding measure constitutional); *Livingstone v. Murray*, 137 Mont. 557, 354 P.2d 552 (1960) (enjoining vote on legislative referendum where measure was unconstitutional); *Harper*, 234 Mont. 259, 763 P.2d 650 (rejecting a challenge to a legislative referendum that the form of the ballot was deficient, allowing election to proceed); *Montanans Opposed to I-166 v. Bullock*, 2012 MT 168, 365 Mont. 520, 285 P.3d 435 (election allowed to proceed, form of ballot initiative not defective); and *State ex rel. Montana Sch. Bd. v. Waltermire*, 224 Mont. 296, 300, 729 P.2d 1297, 1299 (1986) ("[T]his Court has exercised pre-election jurisdiction to remove an initiative from the ballot only when there was a procedural defect or when the initiative was clearly unconstitutional on its face.").

[4] Additionally, the Dissent points out that several cases relied upon by *MEA-MFT* involving pre-election review of an initiative or referendum "came at a time when the law expressly allowed a pre-election contest to an initiative or referendum" to be brought and correctly points out that § 3-5-302(6)(a)(ii), MCA (1995), was repealed. Dissent, ¶ 66. *See* 2007 Mont. Laws ch. 481, § 2. However, that statute specifically authorized actions to be filed as an original proceeding in this Court. Of course, the case *sub judice* was not filed as an original proceeding. Further, the Dissent's reference to § 13-27-316(6), MCA, is similarly misplaced in that § 13-27-316, MCA, an election law provision, specifically addresses the review of proposed initiative ballot statements made by the Attorney General and thus is not applicable here, where the proposed ballot measure is a

¶15    In *Reichert*, a legislative referendum proposed to create seven Supreme Court districts with one justice elected from each, require candidates to be a "qualified elector" in that district, and alter the method of selecting the chief justice. *Reichert*, ¶ 7.  The Court held the referendum was constitutionally infirm on its face because it "attempt[ed] to amend the Constitution by means of a statutory referendum," and the "issues [were] fit for judicial decision."  *Reichert*, ¶ 60.  Specifically addressing the measure's proposed district-based elections, the Court held the legislative referendum's "attempt to alter the structure of the Supreme Court by making it into a representative body composed of members elected from districts is . . . facially unconstitutional.  Neither the Legislature nor the people have the power to alter the constitutionally established structure of government by means of a statutory referendum. . . .  [S]uch amendments to the Constitution must be made through one of the methods permitted by the Constitution itself."  *Reichert*, ¶ 71. *See* Mont. Const. art. XIV, §§ 1, 2, 8, 9.

¶16    Despite *Reichert*'s clear pronouncement that implementing district-based Supreme Court elections requires a constitutional amendment, HB 325 again invokes the legislative referendum process to achieve a redistricting of the Supreme Court.  HB 325—exactly like the referendum in *Reichert*—proposes to splinter the current statewide elections for Montana Supreme Court justices into seven judicial districts, with one justice elected from each.  Although the measure in *Reichert* attempted to implement additional qualifications

---

legislative referendum.  Moreover, *Reichert* and *MEA-MFT* both found pre-election challenges to allegedly facially-defective legislative referenda to be justiciable *after* the repeal of § 3-5-302(6)(a)(ii), MCA.  As these rulings remain good law, the justiciability of such challenges does not turn on the presence of statutory authorization.

for Supreme Court justices—qualifications left out of HB 325—*Reichert* incontrovertibly found the legislative referendum is an unconstitutional vehicle for implementing district-based Supreme Court elections.

¶17    HB 325 requires no such scrutiny of the measure's text; the constitutional infirmities, based on *Reichert*, are manifest.  To the extent any substantive review for constitutionality is required, that review was completed in *Reichert*.  As a result, HB 325, for purposes of determining justiciability, is facially unconstitutional based on judicial precedent. *Reichert* is binding law for this Court and, at this stage of the analysis where justiciability is addressed, establishes that HB 325, like LR 119 (the challenged measure in *Reichert*), is facially unconstitutional. The issue of justiciability and this Court's precedent is to be distinguished from the Secretary's request to reevaluate and overrule *Reichert*, addressed in Issue Two.  Here, this Court, "as [the] final interpreter[] of the Constitution, ha[s] the final 'obligation to guard, enforce, and protect every right granted or secured by the Constitution . . . .'" *Columbia Falls Elem. Sch. Dist. No. 6 v. State*, 2005 MT 69, ¶ 18, 326 Mont. 304, 109 P.3d 257 (quoting *Robb v. Connolly*, 111 U.S. 624, 637, 4 S. Ct. 544, 551 (1884)). *See also Brown v. Gianforte*, 2021 MT 149, ¶ 56, 404 Mont. 269, 488 P.3d 548 (Rice, J., concurring) (Supreme Court has the power to pass upon constitutional questions and its decisions are final and binding law); *McLaughlin v. Mont. State Legislature*, 2021 MT 178, ¶ 18, 405 Mont. 1, 493 P.3d 980.

¶18    The Dissent reasserts concerns raised in *Reichert* that a pre-election challenge to the instant legislative referendum is non-justiciable, and as such constitutes "'an opinion advising what the law would be upon a hypothetical state of facts, or upon an abstract

11

proposition.'" Dissent, ¶ 62 (quoting *Reichert*, ¶ 53). However, there is no advisory opinion here—*Reichert* itself shifted the calculus. The Court has *already* determined it is unconstitutional to implement district-based Supreme Court elections using a legislative referendum, *Reichert*, ¶ 71; therefore, this case implicates none of the concerns articulated in the *Reichert* dissent and we are simply following our precedent to determine the issue of justiciability.

¶19    Although "it should be the rare case in which the Court entertains pre-election review of a ballot measure," the challenge to HB 325 is not a "garden-variety claim." Dissent, ¶ 63.  Instead, HB 325 is that "extraordinary" case meriting pre-election review. *See MEA-MFT*, ¶ 35 (Baker, J., dissenting).  This Court's determination in *Reichert* that enacting district-based Supreme Court elections through legislative referenda is unconstitutional has uniquely binding and conclusive force.  HB 325 is an identical piece of legislation; therefore, *Reichert* operates to render *this* legislative referendum facially unconstitutional for purposes of determining justiciability.

¶20    Lastly, the Secretary also asserts that ruling on the pre-election challenge to HB 325 constitutes a violation of the principle of the separation of powers, as Article III, Section 5(1) grants the Legislature the power to provide for a legislative referendum.  In fact, the legislative process has concluded—the Bill was presented in both houses and passed.  As is the case with other enacted legislation, there is no power left for the Legislature to exercise.  *Cf.* Mont. Const. art. V, §§ 1, 11 (providing for legislative power to enact law by passage of bills).  The Legislature has completed its task.  Moreover, as discussed in *Reichert* and *MEA-MFT*, accepting such pre-election challenges to a proposed

legislative referendum's facial constitutionality takes nothing out of the hands of the Legislature or the voters. *See MEA-MFT*, ¶ 18; *Reichert*, ¶ 59. It changes only the *timing* of the Court's exercise of its prerogative to review statutes for compliance with the Constitution. *See Brown*, ¶ 24 (discussing judicial power of constitutional review (citing *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803)). If HB 325 is not found facially unconstitutional, the referendum vote will proceed as planned; if it is found facially unconstitutional, then allowing it to proceed to the election does nothing to protect voters' rights and creates a false appearance that a vote on a measure means something. Conducting this review now, simply spares voters (and everyone else involved) from being tasked with voting on a proposed measure which ultimately will be determined constitutionally infirm. *See MEA-MFT*, ¶ 18; *Reichert*, ¶ 59.[5]

¶21    *MEA-MFT* and *Reichert* clearly hold that pre-election challenges to the facial constitutionality of proposed legislative referenda that raise sufficiently definite and concrete issues are justiciable. The District Court did not err in concluding that the current dispute regarding HB 325 meets that standard. Importantly, the challenge to HB 325 cannot be held non-justiciable here without first expressly overruling *Reichert* and *MEA-MFT*. And, notably, the Secretary does not assert that the justiciability analyses of *MEA-MFT* and *Reichert* were wrongly decided and must be overruled in a rare departure from stare decisis. In the absence of any argument or briefing contrary to the justiciability

---

[5] Here, as in *Reichert*, the question presented is purely one of law, and no additional facts will aid the Court in its inquiry. *Reichert*, ¶ 60.

13

analysis of *Reichert* and *MEA-MFT*, we decline to re-examine these cases regarding their holdings on justiciability. *See State v. Gatts*, 279 Mont. 42, 51, 928 P.2d 114, 119 (1996) (discussing importance of stare decisis); *State v. Wolf*, 2020 MT 24, ¶ 22, 398 Mont. 403, 457 P.3d 218 ("Principles of law should be definitively settled if that is possible," however, prior decisions may be overruled where statutory construction was "manifestly wrong" (citations and internal quotations omitted)); *Guethlein v. Family Inn*, 2014 MT 121, ¶ 16, 375 Mont. 100, 324 P.3d 1194 (adhering to precedent is "preferred course" when "faced with viable alternatives" (citations and internal quotations omitted)).

¶22 The District Court did not err in relying on controlling precedent from our decision in *Reichert* to determine that the present dispute regarding the constitutionality of HB 325 is justiciable.

¶23 *Issue Two: Does the referendum proposal—which requires that Supreme Court justices be elected district-by-district, rather than statewide—violate the Montana Constitution?*

¶24 The Secretary argues that HB 325, because it does not require Supreme Court justices to live in the district from which they are elected, is distinguishable from the measure found unconstitutional in *Reichert*. Alternatively, the Secretary argues that *Reichert* is no longer good law in light of our recent *Brown* holding and should be substantially modified or overruled.

¶25 The Montana Supreme Court consists of seven justices, of whom one is the chief justice. Mont. Const. art. VII, § 3(1); § 3-2-101, MCA. They serve eight-year terms, and one or two seats come up for election every two years. Mont. Const. art. VII, § 7(2); §§ 3-2-101, -103, MCA; *Reichert*, ¶ 5. Supreme Court justices must reside within the state.

14

Mont. Const. art. VII, § 9(4).  Currently, § 3-2-101, MCA, requires justices to be elected on a statewide basis.

**Whether *Reichert* Can Be Distinguished**

¶26     The legislative referendum struck down as unconstitutional in *Reichert*, LR-119, would have amended existing law to: (1) create seven Supreme Court districts and require each justice be elected from a separate district, rather than an state-wide election; (2) change the method of selecting the chief justice from a statewide election to a selection by the seven justices; and (3) require a candidate for a seat on the Supreme Court be registered to vote and reside in the district from which the candidate would seek election (be a "qualified elector" in that district).  *Reichert*, ¶ 7.  Here HB 325, if approved, would modify § 3-1-101, MCA, as follows:

> 3-2-101. **Number, election, and term of office -- <u>selection of chief justice</u>**. <u>(1)</u> The supreme court consists of a chief justice and six associate justices who are elected <u>in separate districts</u> by the qualified electors of the ~~state at large~~ <u>districts provided in</u> [section 2]. <u>Each justice must be elected</u> at the general ~~state~~ ~~elections~~ <u>election</u> next preceding the expiration of the ~~terms~~ <u>term</u> of office of ~~their predecessors, respectively,~~ <u>the justice's predecessor</u> and ~~hold their offices~~ <u>holds office</u> for the term of 8 years from ~~and after~~ the first Monday of January ~~next~~ succeeding ~~their~~ <u>the justice's</u> election. <u>(2) After the general election in 2024, the chief justice must be selected by the majority vote of the seven justices at the first meeting of the court in each year after a general election.</u>

HB 325 (2021 Mont. Laws ch. 402, § 1) (brackets in original; emphasis in original as proposed statutory amendment).   Thus, this proposal contains the same first two amendments—abolishing state-wide Supreme Court races for associate justices and the chief justice and replacing them with district-wide elections and a selection of the chief

15

justice by the sitting justices—but not the third—imposing a residency requirement—as those included in the legislative referendum found unconstitutional in *Reichert*.

¶27    The Secretary urges that this distinction renders *Reichert* inapplicable here, because its analysis of district-based elections is "impossible to disentangle" from the residency requirement not present in HB 325.  To the contrary, *Reichert* applied a highly methodical approach to LR-119 that neatly divided the residency requirement and the district-based election amendment into separate analyses.[6]  *Compare Reichert*, ¶¶ 67-68 ("First, LR-119 would create new qualifications for the office of Supreme Court justice" by requiring a candidate to "be a qualified elector") *with Reichert*, ¶¶ 69-71 ("Second, LR-119 would alter the structure of the Supreme Court" by "mandat[ing] district-based elections" instead of statewide elections).  *Reichert* separately concluded that (1) the residency requirement impermissibly "supplement[ed]" the constitutional qualifications for Supreme Court candidacy and (2) the district-based elections impermissibly sought to "alter the structure of the Supreme Court by making it into a representative body composed of members elected from districts." *See Reichert*, ¶¶ 68, 70-71.

¶28    Before holding LR-119 facially unconstitutional, the *Reichert* Court rejected the same two arguments made in support of LR-119 that the Secretary now makes in support of HB 325 here: (1) that the record from the 1972 Constitutional Convention shows that the Framers intentionally rejected a constitutional requirement for statewide Supreme

---

[6] *Reichert* did not address the constitutionality of the method of selecting the chief justice, determining that, regardless, that particular amendment could not be severed from the unconstitutional district elections amendment and must therefore fail with it. *Reichert*, ¶¶ 84-88.

Court elections and (2) that Article VII, Section 8(1) supplies the necessary authority to implement the proposed amendments. *Reichert*, ¶¶ 73, 79, 82. *Reichert's* discussion of the 1972 Constitutional Convention was unambiguously made in the context of addressing the constitutionality of district-based Supreme Court elections. *See Reichert*, ¶ 79 ("Plaintiffs argue that the delegates' remarks reflect an intention to broadly empower the electorate to vote for Supreme Court justices on a statewide basis."). With regard to Article VII, Section 8(1), *Reichert* first, briefly, addressed whether that constitutional provision offered any support for LR-119's residency requirement, before expressly turning to spend the next four paragraphs analyzing whether the Article VII, Section 8(1) supplied the necessary authority for district-based elections. *Compare Reichert*, ¶ 74 ("Hence, [Article VII, Section 8(1)] is not authority for LR-119's addition of qualifications (i.e., voter-registration and residency requirements) to the office of Supreme Court justice.") *with Reichert*, ¶¶ 75-78 ("Nor is Article VII, Section 8(1) authority to convert the Supreme Court itself from a statewide elected body into a district-based representative body.").

¶29 Contrary to the Secretary's assertion, this Court has already squarely addressed the constitutionality of a legislative referendum replacing statewide elections for Supreme Court seats with district-wide elections, independent of the question of the constitutionality of a distinct residency requirement not at issue here. Our 2012 *Reichert* precedent is squarely on-point and should, barring a rare departure from the doctrine of stare decisis, be controlling here.

17

**Whether *Reichert* Was Manifestly Wrong**

¶30     The Secretary makes an alternative argument that *Reichert* should be overruled.

> Stare decisis means to abide by, or adhere to, decided cases. It is of fundamental and central importance to the rule of law. Indeed, there is no question but that very weighty considerations underlie the principle that courts should not lightly overrule past decisions. We have held, in this regard, that stare decisis is a fundamental doctrine which reflects our concerns for stability, predictability and equal treatment.
> Court decisions are not sacrosanct, however, and stare decisis is not a mechanical formula of adherence to the latest decision. Indeed, we have held that stare decisis does not require us to follow a *manifestly wrong* decision.

*Gatts*, 279 Mont. at 51, 928 P.2d at 119 (emphasis added, internal citations, quotation marks, and alterations omitted) (citing Black's Law Dictionary, 1406 (6th ed. 1990); *Patterson v. McLean Credit Union*, 491 U.S. 164, 172, 109 S. Ct. 2363, 2370 (1989); *Moragne v. States Marine Lines*, 398 U.S. 375, 403, 90 S. Ct. 1772, 1789 (1970); *Formicove, Inc. v. Burlington Northern, Inc.*, 207 Mont. 189, 194, 673 P.2d 469, 472 (1983)). *See also Wolf*, ¶ 22 ("Principles of law should be definitively settled if that is possible," however, "[t]his Court has made clear that 'the rule of stare decisis will not prevail where it is demonstrably made to appear that the construction placed upon a statute in a former decision is manifestly wrong.'" (quoting *State ex rel. Sparling v. Hitsman*, 99 Mont. 521, 525, 44 P.2d 747, 749 (1935); *State v. Long*, 216 Mont. 65, 84, 700 P.2d 153, 166 (1985) (Weber, J., concurring)) (internal quotation marks and brackets omitted). "Stare decisis provides the 'preferred course' when faced with viable alternatives." *Guethlein*, ¶ 16 (citing *State v. Demontiney*, 2014 MT 66, ¶ 17, 374 Mont. 211, 324 P.3d 344). In order to justify a departure from stare decisis, the Secretary must show that

18

*Reichert* was "manifestly wrong," rather than merely one of several "viable alternatives." *Wolf*, ¶ 22; *Guethlein*, ¶ 16.

*Reichert's* General Article VII Analysis

¶31 The Secretary first asserts that *Reichert* used a "flawed structural analysis of Article VII," leading the Court to conclude that the Montana Constitution envisioned statewide elections for each member of the Supreme Court. In particular, she takes issue with *Reichert's* determination that Article VII, Section 9(4) (providing that Supreme Court justices must live in the state) supported the conclusion that the "Constitution intends Supreme Court justices to be elected and serve on a statewide basis." *See Reichert*, ¶¶ 62-64.

¶32 *Reichert's* structural analysis began by noting that Article VII mandated three kinds of courts: justice courts, district courts, and one supreme court. *Reichert*, ¶ 63. Tellingly, while Section 5(1) expressly provides for county-wide justice of the peace elections, and Section 6(1) expressly provides for the creation of "judicial districts" with district "judges in each district," the Constitution contains no parallel provision for districting of Supreme Court justices. "When a justice or judge is to be selected from a discrete geographic area, the Constitution states that requirement expressly."[7] *Reichert*, ¶ 64.

¶33 Article VII, Section 6 links district court *judges* to *districts* in a way that Supreme Court justices are not. Article VII, Section 6(1), titled "Judicial *districts*" provides that: "[t]he legislature shall divide the state into judicial *districts* and provide for the number of

---

[7] Similarly, the election of representatives and senators from "districts" is made explicit in the text of the Constitution. *Reichert*, ¶ 64 (citing Mont. Const. art. V, §§ 4, 14).

*judges* in each *district*." (Emphases added.) Section 6(2) provides that the "legislature may change the number and boundaries of judicial *districts* and the number of *judges* in each *district*, but no change in the boundaries or the number of *districts* or *judges* therein shall work a removal of any *judge* from office during the term for which he was elected or appointed." (Emphases added.) Article VII is consistent in differentiating the term "judges" for district court judges from the term "justices." *See* Mont. Const. art. VII, §§ 3(1-2), 6(1-3), 7(1-2), 8(1-2), 9(4). Thus, it is clear that when the Constitution envisions judicial *districts*, it provides for them explicitly, as for district *judges* in Section 6. "With respect to Supreme Court *justices*, however, the Constitution could, but does not, specify district elections." *Reichert*, ¶ 64 (emphasis added).

¶34 Emphasizing that the 1972 Constitution did not provide for geographically-restricted Supreme Court elections, *Reichert* noted that "to the contrary," the residency requirements of Section 9(4) provided that justices of the peace must reside "in the county" in which they are elected or appointed, district court judges must reside "in the district" in which they are elected or appointed, and that Supreme Court justices must reside "within the state." *Reichert*, ¶¶ 63-64. The Court concluded that these residency requirements "plainly contemplate that Supreme Court justice, district court judge, and justice of the peace are 'state,' 'district,' and 'county' offices, respectively," which it found to be consistent with its finding that all of the Delegates who spoke at the 1972 Constitutional Convention held the assumption that Supreme Court justices would be selected on a statewide basis while district court judges would be selected on a district-specific basis. *Reichert*, ¶ 64.

20

¶35    The Secretary contends that this reliance on Section 9(4) was misguided, as the requirement that an individual *reside* within the political subdivision in which they serve should carry "no negative implication" that they must necessarily be *selected* by the electorate of that political subdivision.   The Secretary misapprehends the nature of *Reichert's* analysis.  *Reichert* did not assert that Article VII, Section 9(4), alone, established that Supreme Court elections were to be held on a statewide basis.  Rather, the Court looked at the structure of the Constitution requiring county justices of the peace to run in *county* elections in which they live, district court judges to preside over *districts* in which they live, and Supreme Court justices to preside over the *state* in which they live, and found a clear pattern suggesting that individuals holding these offices were to be selected on the basis of the polity in which they lived and served and that, when "the Constitution intends" judicial officers (or legislators) to be elected on a less than state-wide basis, it "states that requirement expressly."  *Reichert*, ¶¶ 62-64.  *Reichert* found this conclusion was further corroborated by its reading of the debate among the Delegates at the 1972 Constitutional Convention as demonstrating that the Delegates who spoke assumed that Supreme Court justices would be selected on a state-wide basis.  *Reichert*, ¶ 64.

¶36    Notably, *Reichert's* ultimate holding was based not only on the structure and text of the document and the words of the 1972 Delegates, as discussed above, but also on "the Supreme Court's function."  *See Reichert*, ¶ 65.  The Court concluded that, given the Supreme Court's statewide jurisdiction, "it would be incongruous to interpret the Constitution as contemplating a Supreme Court made up of justices who are elected from districts and implicitly 'represent' regional interests," as "[s]uch an interpretation would

21

be inimical to the judicial function" that requires justices to "interpret and apply the law on a uniform basis statewide" and forbids them from "'represent[ing]' particular constituencies or interest groups." *Reichert*, ¶ 65 (citations omitted). *Reichert* concluded that these principles "are implicit in the constitutional design, which establishes the office of Supreme Court justice as one subject to selection by electors statewide." *Reichert*, ¶ 65.

¶37 The Secretary does not contest the substance of *Reichert's* "function" analysis. *See Reichert*, ¶ 65. We agree with *Reichert's* conclusion that, should the Framers of the 1972 Constitution have contemplated such a highly-unusual departure from the long-established function of a Supreme Court, their debate and the text of the ultimately resulting document would have explicitly provided as much, rather than implying the opposite. A quibble with the import of Section 9(4)'s residency requirements, in the context of a much larger analysis of constitutional text and structure, framer's intent, and Court function, falls far short of demonstrating that the holding was so "manifestly wrong" as to justify a departure from stare decisis.

¶38 The Secretary asserts that the 1972 Constitutional Convention transcript does contain evidence that the Delegates did not wish to require statewide Supreme Court elections. The Secretary argues that a proposal containing language that would have expressly provided for statewide Supreme Court elections was rejected, thereby implying that the Framers of the 1972 Constitution did not intend to require such elections and instead wished to leave the matter up to legislative discretion. This same argument was advanced, analyzed, and rejected in *Reichert*:

As discussed in [*State ex rel. Racicot v. First Jud. Dist. Ct.*, 243 Mont. 379, 387-88, 794 P.2d 1180, 1184-85 (1990)], the Judiciary Committee presented the delegates with two different proposals. The majority proposal provided for the selection of justices and judges primarily through general elections, while the minority proposal provided for the selection of justices and judges through a system of appointment with an approval-or-rejection election for each succeeding term. The delegates voted to adopt the minority proposal, but then, in a series of debates and amendments before the committee of the whole, broadened its election provisions. In the midst of those debates, Delegate Holland moved to amend part of the minority proposal by substituting the following language taken from Section 6 of the majority proposal: "The justices of the Supreme Court shall be elected by the electors of the state at large, and the term of the office of the justices of the Supreme Court, except as in this Constitution otherwise provided, shall be six years." *See* Montana Constitutional Convention, Verbatim Transcript, Feb. 29, 1972, p. 1086; Montana Constitutional Convention, Judiciary Committee Proposal, Feb. 17, 1972, vol. I, p. 487. Ultimately, this amendment failed by a narrow margin. Montana Constitutional Convention, Verbatim Transcript, Feb. 29, 1972, p. 1099. And from this fact, the State posits that "the attempt to constitutionally require the election of Supreme Court Justices at-large was rejected by the convention."

We cannot agree with this inference. Delegate Holland's amendment was the third of five proposals that were placed before the delegates concerning the selection of Supreme Court justices and district court judges. The sole question being debated at the time was whether justices and judges should be elected, appointed, or some combination of the two. There is no indication in the delegates' discussion that they objected to the "state at large" portion of Delegate Holland's proposal. To the contrary, *the assumption of all who spoke on the question was that, under whatever system the delegates finally adopted, Supreme Court justices would be selected on a statewide basis* and district court judges would be selected on a district-specific basis. A careful reading of the transcript reveals that Delegate Holland's amendment was rejected because a majority of the delegates favored an approach involving merit-based appointments with the justice or judge having to stand for election at each succeeding term. It would be extraordinary to conclude that the delegates intended by their vote on Delegate Holland's amendment to "reject" Montana's decades-old system of electing Supreme Court justices by the electors of the state at large, without even a single word by any of the delegates directed to this issue and without any language to this effect in [the] Constitution itself.

*Reichert*, ¶¶ 80-81 (emphasis added).

23

¶39    *Reichert's* analysis is sound.  The Secretary's only new argument on this matter is an assertion that the Delegates generally preferred to leave most matters to legislative, rather than constitutional, resolution and a citation to *Brown*, ¶ 41, discussing the competing judicial selection proposals resulting in a compromise that left substantial discretion in the hands of the Legislature.  While the Framers of the 1972 Constitution undoubtedly left many of the details of governance up to the Legislature, they placed a number of important matters—significantly, those relating to the frame of government— beyond legislative reach.  Moreover, *Brown's* conclusion that the constitutional provision at issue was intended to provide for a degree of legislative discretion in the nomination procedure for vacancies was based on the history of the competing proposals at the Convention and the resulting compromise measure.  *See Brown*, ¶¶ 34-41.  The Secretary points to no corresponding evidence of competing provisions or compromise with regard to the election of justices on a statewide or district-wide basis.  The Secretary points to no statements in the Convention transcripts to refute *Reichert's* conclusion that, while the delegates disagreed over whether justices would be elected, appointed, or both, the Convention transcripts demonstrate that all who spoke on the matter evinced an assumption that any such elections would be statewide.  *See Reichert*, ¶ 64.  *Reichert's* analysis remains sound and the Secretary fails to show that the decision was manifestly wrong.

¶40    Moreover, Plaintiffs point to Article VII, Section 8(3) as providing more support for *Reichert's* conclusion.   Section 8(3) provides that judicial incumbents facing no challengers for reelection must "nevertheless be placed on the general election ballot to allow the *voters of the state* or district to approve or reject him."  (Emphasis added.)  This

24

assumes that some candidates for judicial office will face district-wide elections, while others will face a statewide election. The Secretary responds that the Framers were simply leaving their options open for the potential for either statewide or district-based elections. This construction would have rendered the words "of the state or district" surplusage, however, as the Framers could have reached that result by omitting the term altogether and more simply allowing "the voters to approve or reject" the incumbent. *See Gannett Satellite Info. Network Inc. v. State Dep't of Revenue*, 2009 MT 5, ¶ 19, 348 Mont. 333, 201 P.3d 132 ("We must avoid a statutory construction that renders any section of the statute superfluous or fails to give effect to all of the words used."); *Marbury*, 5 U.S. (1 Cranch) at 174 ("[I]t cannot be presumed that any clause in the constitution is intended to be without effect[.]"). Clearly, Section 8(3) further supports *Reichert's* conclusion that the 1972 Constitutional Convention Delegates assumed that Supreme Court justices would be selected on a *statewide* basis, consistent with the accepted function of a *state* supreme court.

*Reichert's* Article VII, Section 8(1) Analysis

¶41    The Secretary's main argument takes issue with *Reichert's* conclusion that Section 8(1)—approved by referendum in 1992 and providing that "[s]upreme court justices and district court judges shall be elected by the qualified electors *as provided by law*"—did not authorize the Legislature to implement district-based Supreme Court elections. Mont. Const. art. VII, § 8(1) (emphasis added). *See* 1991 Mont. Laws ch. 475. In particular, the Secretary argues that (a) a proper textual analysis of Section 8(1), guided by our recent

25

decision interpreting similar language in *Brown*, is at odds with *Reichert's* analysis and (b) *Reichert's* reliance on contextual factors in interpreting Section 8(1) was misguided.

*Text of Article VII, Section 8(1)*

¶42 The Secretary urges that a proper reading of Section 8(1)'s as "provided by law" language is sufficient to provide the necessary constitutional authorization for district-based Supreme Court elections. She points out that the phrase provided by law is used throughout Article VII, and that the Legislature has enacted laws implementing many of these provisions. The Secretary asserts that our *Brown* decision established that the term grants the Legislature broad authority over the judicial selection process when used in Article VII.

¶43 In *Brown*, we examined a statute that abolished the Judicial Nomination Commission and replaced it with a different procedure by which nominees to fill judicial vacancies would be selected. *Brown*, ¶ 34. The law's challengers asserted that it violated Article VII, Section 8(2), which provides in relevant part that "[f]or any vacancy in the office of supreme court justice or district court judge, the governor shall appoint a replacement from nominees selected in the manner provided by law." We examined the 1972 Constitutional Convention transcripts, which demonstrated that the Delegates had disagreed as to whether to create a nomination commission or give the governor nearly unfettered discretion in making judicial appointments. *Brown*, ¶¶ 35-39. The eventual outcome, we determined, was a compromise that neither "mandated a commission/committee, nor precluded it, but rather delegated the process for selecting nominees [to fill judicial vacancies] to the Legislature in broad language that the selection

26

of nominees be 'in the manner provided by law.'" *Brown*, ¶¶ 39, 41. Importantly, we then concluded that, "[a]lthough the Constitution delegates the process for selecting judicial nominees to the Legislature, the process itself is not without constitutional bounds" such that "[t]he fact that the process does not require a commission to achieve that objective [(of appointing good judges)] does not mean that any process will be constitutionally sound." *Brown*, ¶¶ 42, 43. We went on to determine whether the new selection process at issue "achieves the constitutional objective the Framers sought to achieve by the enactment of Article VII, Section 8(2)," eventually answering that question in the affirmative. *Brown*, ¶¶ 43-50.

¶44 The Secretary argues that our construction of the "in the manner provided by law" language of Section 8(2) as permitting a change in the judicial nomination process must lead us to conclude that Section 8(1)'s provision that Supreme Court justices "shall be elected by the qualified electors *as provided by law*" allows the Legislature to decide, including by method of public referenda, "which 'qualified electors' elect justices," notwithstanding *Reichert's* holding to the contrary. The Secretary points to the presumption that the same word carries the same meaning throughout a document. *See Kottel v. State*, 2002 MT 278, ¶ 43, 312 Mont. 387, 60 P.3d 403 (applying the presumption in construing the word "general" in the Montana Constitution).

¶45 First, the presumption cited by the Secretary is just that, a presumption, and is far from definitive on the construction of a particular provision. *See Atlantic Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433, 52 S. Ct. 607, 609 (1932) ("But the presumption is not rigid and readily yields whenever there is such variation in the

27

connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the act with different intent."). *Cf.* Black's Law Dictionary 1435 (Bryan A. Garner, ed., 11th ed. 2019) (defining a "*conclusive* presumption" as a "presumption that cannot be overcome by any additional evidence or argument" (emphasis added)). Notably, in the only case cited by the Secretary where this presumption has been applied to a constitutional provision, it was used only as further "support[]" for an interpretive conclusion that was informed by a number of analytical tools, including structural and historical considerations like those relied upon by *Reichert*. *See Kottel* ¶¶ 40-45.

¶46     Second, even assuming that the phrase "as provided by law" granted the Legislature the magnitude of discretion the Secretary argues for, it is far from clear that such a grant of authority would do what the Secretary supposes it does. Section 8(1) states that justices and judges "shall be elected by the qualified electors as provided by law." The Secretary presumes that the answer to the question of who may constitute the electorate—all of Montana's voters versus merely those in a particular district—shall be "provided by law." However, Section 8(1) specifies who shall do the electing: the "qualified electors," a term that is defined elsewhere in the Constitution. *See* Mont. Const. art. IV, § 2. Thus, "as provided by law" modifies not the determination of *who* shall do the electing, but, rather, *how* the judges and justices shall "be elected."[8]

_____

[8] Article IV, Section 3 provides that the "legislature shall provide by law" for "the administration of elections" generally. Of course, while it is undisputed that this language grants the Legislature a substantial measure of discretion in the administration of elections, nothing about the grant of authority in Article IV, Section 3 could be construed to allow the Legislature to determine that the

28

¶47     Relatedly, *Brown* did *not* interpret the phrase "provided by law" as used in Section 8(2) as granting the Legislature carte blanche to fill judicial offices however it pleases. To the contrary, we found that, even when a process, generally, had been delegated to the Legislature, it was "not without constitutional bounds" as determined by the objectives of the Framers. *Brown*, ¶¶ 42-43. *Brown* engaged in a detailed analysis of the text and the drafting history of the relevant provision to determine what those bounds were in relation to the challenged law. *See Brown*, ¶¶ 34-50. As discussed elsewhere in this Opinion, *Reichert* correctly ascertained the applicable bounds over Section 8(1) when it found that the structure of Article VII strongly evidenced an intent that Supreme Court justices be elected on a state-wide basis, consistent with the words of the 1972 Constitutional Convention Delegates and the established function of the Supreme Court as an adjudicatory body of state-wide jurisdiction, not a representative body. *See Reichert*, ¶¶ 64-65. The Secretary's proposed textual analysis of Section 8(1) does not support the conclusion that *Reichert* was "manifestly wrong."

*History of Art VII, Section 8(1)*

¶48     The Secretary argues that *Reichert's* Section 8(1) analysis went off the rails when it examined the historical context of the provision, which was approved as a constitutional amendment by ballot referendum in 1992. She claims that (a) resort to non-textual tools

---

Governor shall be elected by the voters of a single district, while candidates for the House of Representative or the Senate are selected on a statewide, rather than on a district, basis in the face of clear indications of constitutional intent to the contrary. *See* Mont. Const. art. V, § 14 (providing for House and Senate districts); Mont. Const. art. VI, § 2 (providing that the office of governor and other executive positions shall be elected by "the qualified electors" at a general election as "provided by law").

with regard to Section 8(1) is unjustified and (b) the relevant history did not support *Reichert's* conclusion that the measure was not intended to allow for district-based Supreme Court elections in any event.

¶49    In support of her assertion that unambiguous constitutional language must be interpreted without reference to extrinsic sources of information, the Secretary cites to *Nelson v. City of Billings*, 2018 MT 36, ¶ 14, 390 Mont. 290, 412 P.3d 1058. *Nelson* states that "[b]orrowing from the rules of statutory construction, we often declare that we must discern the Framers' intent from the plain meaning of the language used and may resort to extrinsic aids only if the express language is vague or ambiguous." *Nelson*, ¶ 14 (citations omitted).  The Secretary disregards, however, *Nelson's* following statement: "*[e]ven in the context of clear and unambiguous language*, however, we have long held that we must determine constitutional intent not only from the plain meaning of the language used, but also in light of the historical and surrounding circumstances under which the Framers drafted the Constitution, the nature of the subject matter they faced, and the objective they sought to achieve." *Nelson*, ¶ 14 (citations omitted, emphasis added).[9]  We recently reaffirmed this conclusion in *Brown*, ¶¶ 33 and 43 (citing *Nelson*, ¶ 14).  *Reichert* was not manifestly wrong when it relied upon the context and history of Article VII Section 8(1) in determining whether the provision allowed for district-based Supreme Court elections.

---

[9] The other source the Secretary cites to in support of her assertion regarding unambiguous language is a book on textualist interpretation methods.  *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012).  Neither this source nor its proposed approach to legal interpretation are binding law and do not abrogate our clear contrary holdings in Montana.

¶50    The Secretary also disputes *Reichert's* reading of the relevant history surrounding Article VII, Section 8(1), labelling it "inconclusive."  *Reichert* found that the relevant history leading up to the amendment of Article VII, Section 8(1) in 1992 clearly established that the amendment (Amendment 22) had been intended to close a perceived "loophole"— identified by the then Secretary of State and highlighted in a subsequent Supreme Court case—that could allow judicial appointees to fill vacancies without facing a retention election until well after the expiration of their predecessor's term.  *See Reichert*, ¶¶ 75-78; *State ex rel. Racicot v. First Jud. Dist. Ct.*, 243 Mont. 379, 391, 794 P.2d 1180, 1187 (1990) (concluding that, under the 1972 version of Article VII, Section 8, a Supreme Court justice or district court judge "need not stand for election until the next election after the Senate's confirmation of the nominee," which, if the Senate was not currently in session, would not occur until the next session, with the appointee serving in the interim).  *Reichert* concluded that the Amendment was merely "a timing measure" intended to "ensur[e] that appointees would face election in a timely manner and that no appointee could serve past the expiration of his or her predecessor's term without standing for election."  *Reichert*, ¶¶ 77-78.  *Reichert* concluded:

> Nothing in the plain language of Article VII, Section 8 (as amended) or in the history of [Amendment 22] indicates that the 1992 amendments were intended—or even contemplated—to grant the Legislature power to convert the Supreme Court from an institution composed of members elected on a statewide basis into a representative body composed of members elected from separate districts.  The State is mistaken in its claim that Section 8(1) grants such authority.  If anything, the proponents' views indicate that [Amendment 22] was intended to strengthen the right of "all Montanans" to vote for Supreme Court justices, not take that right away.

*Reichert*, ¶ 78 (emphasis omitted).

31

¶51 The Secretary challenges the notion that such a significant alteration to the form of the judiciary could not have been contemplated at the time. She points to general language in the measure's title: "[a]n Amendment to . . . Generally Revise the Law Relating to the Selection of Supreme Court Justices and District Court Judges . . ." and the summary in the Montana Voter's Guide to the 1992 General Election (Voter's Guide)[10] stating that the amendment "would clarify procedures for election of supreme court justices and district court judges and for the filling of vacancies." Voter's Guide at 4.

¶52 However, continued reading of the Voter's Guide conclusively demonstrates the specific purpose to which the amendment was addressed. Immediately following the portion quoted by the Secretary, the Voter's Guide summary continues: "Judges appointed to fill a vacancy would be confirmed by the senate and serve until the expiration of the term of the judge whose position is being filled. *No appointee could serve past the term of his or her predecessor without standing for election*." (Emphasis added.) Even more explicit, the subsequent "Argument FOR Constitutional Amendment 22" portion of the Voter's Guide stated:

> Montanan[s] expect and deserve to have their judges elected on a timely basis. A recent Montana Supreme Court interpretation of [the] Montana Constitution permits newly appointed judges to carry past the term of their predecessor without facing an election. Without changing the constitution, it would be possible to have judges avoid facing election if a succession of resignations and appointments occurred. This proposed amendment to the constitution prevents this from happening. . . .

---

[10] Montana Voter's Guide, https://archive.org/details/montanavotersgui1992montrich/page/4/mode/2up. [https://perma.cc/6GF7-DHXC] (last visited August 10, 2022).

32

The current practice has thwarted the electoral process by allowing judges and justices to resign in the off-year which *permits their appointed successors to serve a full three years before they have to stand for election*."

Voter's Guide at 4 (emphasis added). The passage concluded:

This amendment seeks to bolster the constitution *in guaranteeing the right of all Montanans to vote* and participate in the electoral system while maintaining the balance of powers between the three branches of government by eliminating the potential for improper use of the appointment process.

If you subscribe to the notion that *the Montana voter has a right to have executive judicial appointments face elections* in a timely fashion, vote FOR Constitutional Amendment 22.

Voter's Guide at 5 (original emphasis omitted, subsequent emphasis supplied).

¶53    The Voter's Guide cited by the Secretary could not have been more clear: far from constituting a seismic shift in allowing for the restructuring of the Supreme Court into a representative body, Section 8(1) was intended, as we concluded in *Reichert*, to be a mere "timing measure" to ensure that appointed judges and justices did not evade the electorate for up to three years. Moreover, it was premised on a concern for protecting "the right of *all* Montanans to vote and participate" in the selection of members of the judiciary. (Emphasis added.) *Reichert* was correct in determining that Article VII, Section 8(1) was not intended to authorize district-based Supreme Court elections. Such a severe restriction on Montanans' voting rights could not have been slipped into the Montana Constitution in such a benign form.

## CONCLUSION

¶54    The Secretary seeks to minimize just how consequential HB 325 would be to Montanans. Far from the trivial procedural adjustment the Secretary suggests, HB 325 would, contrary to the spirit of protecting the right of all Montanans to vote that animates

33

Section 8(1), *deny each Montanan their right to vote in the election of six out of the seven justices* on their state Supreme Court and in the selection of the chief justice. The implications are not merely philosophical. The Supreme Court has statewide appellate jurisdiction, general supervisory control over "all other courts," authority to make rules governing practice and procedure for "all other courts," and authority to make rules governing admission to the bar and the conduct of its members. *Reichert*, ¶ 65; Mont. Const. art. VII, § 2. It has original jurisdiction over writs of habeas corpus, Article VII, Section 2(1), and issues binding rulings on a wide range of matters, ranging from criminal justice to property law, contractual disputes, child custody, and fundamental constitutional rights.[11] HB 325 would deny Montana voters a say in the identity of six out of the seven individuals responsible for such weighty decisions affecting their lives.[12]

---

[11] HB 325's removal of the public's ability to vote for chief justice similarly has significant implications. The chief justice is tasked with numerous powers and responsibilities, which include, to name only a few, reassigning judges for temporary service in different districts or counties, providing notice to the governor of judicial vacancies, appointing a nominee to fill judicial vacancies if the governor fails to do so within the allotted time, appointing water judges, serving as the presiding officer of the district court council, certifying election of district court judges to the judicial standards commission, and appointing members to the working interdisciplinary network of guardianship stakeholders. Mont. Const. art. VII, § 6(3) (temporary reassignment of District Court judges), 8(2) (appointment of replacements for judicial vacancies); § 3-7-221, MCA (water judge appointment); § 3-1-1602, MCA (district court council); § 3-1-1101, MCA (judicial standards commission); § 3-1-901, MCA (judicial vacancies); § 3-1-710, MCA (guardianship). Under HB 325, the chief justice would be chosen by supreme court justices, rather than the voters statewide.

[12] Furthermore, because the Court usually sits in panels consisting of less than the full seven justices, in a number of instances, Montana voters would find themselves subject to binding decisions in which they were able to vote for or against *none* of the justices deciding the case. *See* Montana Supreme Court Internal Operating Rules, Section I(2) (providing for rotating five-justice panels). Further, many Court orders issued on motions are signed by only a *single* justice, meaning that approximately six out of seven Montanans will have had *no say* in the identity of the individual issuing a given binding order of this type. *See* Montana Supreme Court Internal Operating Rules, Section V (providing for orders signed by the chief justice on behalf of the Court).

¶55 Moreover, under the district-based Supreme Court elections proposed by HB 325, unlike elections for members of a representative body such as the Legislature, no Montana voter will have gained any countervailing "representation" of their "interests," vis-à-vis those of voters in other districts. Justices are tasked with applying the law fairly and uniformly statewide and forbidden from representing any "constituency" or its interests. As we explained in *Reichert*:

> Legislative and executive officials serve in representative capacities, as agents of the people, whose primary function is to advance the interests of their constituencies. Judges, in contrast, are not political actors. They do not sit as representatives of particular persons, communities, or parties; they serve no faction or constituency. It is the business of judges to be indifferent to popularity. They must strive to do what is legally right, all the more so when the result is not the one "the home crowd" wants. Even when they develop common law or give concrete meaning to constitutional text, judges act only in the context of individual cases, the outcome of which cannot depend on the will of the public.

*Reichert*, ¶ 65 (quoting *Republican Party of Minn. v. White*, 536 U.S. 765, 805-06, 122 S. Ct. 2528, 2551 (2002) (Ginsburg, Stevens, Souter, & Breyer, JJ., dissenting) (internal formatting, quotation marks, and citations omitted)).

¶56 Under HB 325, Montana voters will not have gained a representative on the Supreme Court and "their" justice will be duty-bound to decline to advance their interests. The obligation of Supreme Court justices is to interpret and apply the law on a uniform basis statewide. The requirements and protections of the Constitution and the law do not vary from one county or district to another. "They are the same whether one is from Yaak, Broadus, Wisdom, or Plentywood. Ethical rules do not permit judges to 'represent' particular constituencies or interest groups." *Reichert*, ¶ 65 (citing M. C. Jud. Cond. 2.2 (Impartiality and Fairness), M. C. Jud. Cond. 2.3 (Bias, Prejudice, and Harassment))

35

(internal quotation marks omitted). Quite simply, Montana voters will have lost a say in selecting all but one of the members of their Court.

¶57 The right to vote is fundamental. *See* Mont. Const. art. II, § 13. *See also Yick Wo v. Hopkins*, 118 U.S. 356, 370, 6 S. Ct. 1064, 1071 (1886). Moreover "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds v. Sims*, 377 U.S. 533, 555, 84 S. Ct. 1362, 1378 (1964). The Montana Constitution, both as originally approved in 1972 and as amended in 1992, clearly entrusts the people of Montana with the election of the members of their Supreme Court. Nothing in the text, history, or purpose of the Montana Constitution, or our subsequent interpretations of it, authorizes the drastic diminishment of this right entailed by HB 325.[13]

¶58 We affirm the District Court's ruling for Plaintiffs on cross-motions for summary judgment and affirm the District Court in enjoining the Secretary from placing HB 325 on the ballot in the 2022 general election.

/S/ MIKE McGRATH

We Concur:

/S/ LAURIE McKINNON
/S/ JAMES JEREMIAH SHEA
/S/ INGRID GUSTAFSON
/S/ DIRK M. SANDEFUR

---

[13] The Secretary does not assert that the provision for changing the method of selecting the chief justice can be severed from the unconstitutional district-based election system. As we did in *Reichert*, ¶¶ 84-88, we conclude that the provision for selection of the chief justice cannot be severed from the remainder of the referendum without "completely rewriting" it. HB 325 therefore fails in its entirety and we need not rule separately on the constitutionality of the provision changing the method by which the chief justice is selected.

Justice Beth Baker, dissenting.

¶59 This case presents important differences from *Reichert* that should lead the Court to refuse consideration of the merits of Plaintiffs' constitutional challenge. Concluding that the issues are not ripe for review, I dissent from the Court's decision on Issue One and would not address Issue Two.

¶60 As the Court acknowledges, ripeness is part of a threshold justiciable-controversy determination that must precede its exercise of jurisdiction. Opinion, ¶ 8. Justiciability depends on a showing that the case presents an actual controversy, as opposed to a hypothetical question. *Reichert*, ¶ 54. The Court concludes that justiciability of this dispute is determined by "factually on-point precedent." Opinion, ¶ 13.

¶61 But this case lacks the temporal urgency that drove our expedited consideration in *Reichert*. Discussing "the constitutional component of ripeness," the *Reichert* Court noted that by placing the referendum on the June 2012 primary ballot, the Legislature created a situation by which the resulting disenfranchisement of voters would occur in the very election cycle in which they cast ballots for the ballot measure. *Reichert*, ¶ 58. This was true because all Montana voters would vote in the primary election for all Supreme Court candidates, but only voters in the Fifth and Sixth judicial districts would be able to cast a ballot in the general election. Because of that immediate impact, the Court concluded that "[t]he issues presented are definite and concrete, not hypothetical or abstract, and [the] case thus presents a controversy in the constitutional sense." *Reichert*, ¶ 58. Here, there is no such immediacy. HB 325 applies to the election and appointment of Supreme Court justices "to terms that begin on or after" its approval by the electorate. Mont. HB 325,

37

§ 7. The affected terms will begin in January 2023, and the election cycle that first would implement the statutory changes would be in 2024.

¶62 The Court dismisses this distinction, emphasizing *Reichert*'s determination of facial invalidity as a reason to exercise jurisdiction because the measure would deprive the plaintiffs "of their right to vote for each seat on the Supreme Court." Opinion, ¶ 9 (quoting *Reichert*, ¶ 58). But the full context of the paragraph from which the Court quotes makes clear that *Reichert* found the case to present a "definite and concrete" controversy "in a constitutional sense" because the measure would be "effective immediately" and would "creat[e] a residency requirement and thereby disenfranchis[e] Plaintiffs[,]" particularly those in the proposed Districts 5 and 6, which were on the ballot that same election year. *Reichert*, ¶ 58. HB 325 contains neither of these features. In the constitutional sense, a justiciable controversy depends on resolving a concrete dispute, "as distinguished from an opinion advising what the law would be upon a hypothetical state of facts, or upon an abstract proposition." *Reichert*, ¶ 53 (citation omitted). In this case, because of the differences from the referendum before us in *Reichert*, there simply is no immediate concrete danger of disenfranchisement that could not be addressed in the ordinary course of constitutional litigation on the merits if, and only if, HB 325 were to be approved by the electorate.

¶63 Though the Court references previous decisions in which we have entertained pre-election challenges to determine the facial validity of a ballot measure, it is losing sight of the narrow category of cases in which such review is appropriate and why this case does not fit that category. Our historical judicial restraint is rooted in the people's

38

reservation of their right to change the laws or the Constitution through the initiative and referendum process. Mont. Const. art. III, §§ 4-5, art. XIV, §§ 8-9. Keeping in mind the Constitution's intent "to maintain the maximum power in the people[,]" *Nicholson*, 265 Mont. at 411, 877 P.2d at 488 (citation omitted), and honoring the constitutional principles underlying a ripeness inquiry, it should be the rare case in which the Court entertains pre-election review of a ballot measure, especially one that has come through the legislative process. Not every garden-variety claim that a measure is unconstitutional should pass that threshold.

¶64    In the State's fifty years under the 1972 Constitution, this Court has on only four occasions stepped in to preempt a measure referred by the Legislature from reaching the ballot, until today. In the first, *Harper*, the Court invalidated a legislative referendum for a proposed constitutional amendment because the proposal was beyond the power of initiative granted the people by the state constitution. 213 Mont. at 428, 691 P.2d at 828. The proposal would have directed the Legislature "to adopt a resolution requesting Congress to call a constitutional convention for the purpose of adopting a balanced budget amendment." *Harper*, 213 Mont. at 428, 691 P.2d at 828. It also would have required legislators to remain in session for three days without pay if they did not pass the described resolution within ninety legislative days. *Harper*, 213 Mont. at 429, 691 P.2d at 829. We held that the measure would contravene both the "independent legislative power" prescribed in the Montana Constitution and the separate mandate of the United States Constitution that amendments be proposed by Congress or "on the application of

39

[state] legislatures," which the people could not coerce. *Harper*, 213 Mont. at 429-30, 691 P.2d at 829.

¶65    The second case, *Cobb*, involved a legislatively proposed constitutional amendment that, if passed, "would leave a defect in the constitution which could not be remedied except by another election." 278 Mont. at 309, 924 P.2d at 269. And the Court in *Reichert* entertained the challenge in large part because the proposed law "would effectively create two new qualifications for Supreme Court justice: at the time of election or appointment, the justice (a) must be registered to vote and (b) must be a resident not merely of 'the state,' [as the Constitution provides,] but of *a specific portion of* the state— specifically, a county within the Supreme Court district from which the justice is elected or appointed." *Reichert*, ¶ 68. This was a fatal constitutional defect in the measure because of well-established law that "when the Constitution has prescribed the qualifications required to hold a particular office, neither the Legislature nor the people have the power to supplement the constitutional pronouncement by prescribing additional qualifications." *Reichert*, ¶ 68. We went further, unnecessarily in my view, to hold that the referendum also "would alter the structure of the Supreme Court by converting it from a statewide elected institution into a district-based representative body[,]" which could be achieved only by constitutional amendment. *Reichert*, ¶ 82.

¶66    The fourth case, *MEA-MFT*, followed closely on the heels of *Reichert* and, for the reasons stated in my Dissent, similarly strayed from the narrow exception to pre-election review. *MEA-MFT*, ¶¶ 36-39 (Baker, Rice & Cotter, J.J., dissenting). The Court in *MEA-MFT* cited several cases invoking pre-election review of ballot measures

40

that came at a time when the law expressly allowed a pre-election contest to an initiative or referendum if it challenged a "constitutional defect in the substance of a proposed ballot issue[.]" Section 3-5-302(6)(a)(ii), MCA (1995). That provision no longer exists. The law now preserves "the right to challenge a constitutional defect in the substance of an issue *approved by a vote of the people*." Section 13-27-316(6), MCA (emphasis added). The Court's dismissal of these statutory references as applying only to original proceedings or to citizen-initiated measures (Opinion, ¶ 14 n.4) misses the point. Whether brought by citizen petition or by the Legislature, challenged in district court or in this Court, a ballot measure is a ballot measure; it is not a law.

¶67 Importantly, neither *Reichert* nor the Opinion today recognizes a key problem with addressing the merits of HB 325 prior to approval, if at all, by the electorate. As briefly noted, HB 325—like LR 119 considered in *Reichert*—also changes the law to require that the Chief Justice be selected by the other six members of the Court. Neither *Reichert* nor the Court in this case decides whether that provision would pass constitutional muster. *See* Opinion, ¶ 57 n.13; *Reichert*, ¶ 88. We reasoned in *Reichert* that, despite an express severability clause, the provision was not capable of being severed because "salvaging this part of the referendum would involve completely rewriting the title, the ballot statement, the statements of implication, and the text of the referendum itself—which the courts are not situated to do." *Reichert*, ¶ 88.

¶68 The principle of severability, stated simply, is that "[i]f, when an unconstitutional portion of an act is eliminated, the remainder is complete in itself and capable of being executed in accordance with the apparent legislative intent, it must be sustained."

41

*Reichert*, ¶ 86 (quoting *Mont. Auto. Ass'n. v. Greely*, 193 Mont. 378, 399, 632 P.2d 300, 311 (1981)). "The inclusion of a severability clause in a statute is an indication that the drafters desired a policy of judicial severability to apply to the enactment." *State v. Theeler*, 2016 MT 318, ¶ 12, 385 Mont. 471, 385 P.3d 551 (quoting *Williams v. Bd. of Cty. Comm'rs of Missoula Cty.*, 2013 MT 243, ¶ 64, 371 Mont. 356, 308 P.3d 88).[1] "When unconstitutional provisions are severed, the remainder of the statute must be complete in itself and capable of being executed in accordance with the apparent legislative intent." *Williams*, ¶ 64. The operative terms in these references are "*act*," "*statute*," and "*enactment*." The Court would be able to undertake a proper severability analysis, construing the entire measure in light of its express severability clause, if the measure were to become law. At that point, the Court's review would not be cluttered with concerns about judicially rewriting all of the statutorily prescribed components of a ballot measure. It could consider the measure like any other duly enacted law to ascertain whether it would be possible to uphold that provision. The Court's pre-election intervention, as in *Reichert*, makes it unworkable to conduct that analysis—further reason not to consider the merits before the election.

¶69 Finally, "[r]ipeness asks whether an injury that has not yet happened is sufficiently likely to happen or, instead, is too contingent or remote to support present adjudication[.]" *Reichert*, ¶ 55 (citing 13B Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper,

---

[1] *Reichert* failed to acknowledge that it is "[i]n the *absence* of a severability clause [that] this Court 'must determine whether the unconstitutional provisions are necessary for the integrity of the law or were an inducement for its enactment.'" *Williams*, ¶ 64 (citations omitted, emphasis added).

*Federal Practice and Procedure* §§ 3531.12, 3532.1, 163, 383 (3d ed. 2008)). Of course, when the decision is in voters' hands, whether the alleged harm "is sufficiently likely to happen" is difficult to predict. In my view, though, it is far from given that Montanans would choose to vote themselves out of the process for selecting the members of this Court.[2] If they do not, the issues raised here will not need our review. Because of that uncertain contingency, and in the face of constitutional limitations on the judicial power, we should let the process run its course before putting the Court's own thumb on the scale. Quite simply, we should not be advising on the constitutionality of a measure that has not become law when there is no present threat to disenfranchisement as there was in *Reichert*. Instead, in an ironic turn, the Court denies Montanans the right to vote so that they cannot be denied the right to vote. I would reverse the District Court's determination of ripeness and stop there.

/S/ BETH BAKER

Justice Jim Rice joins in the Dissent of Justice Beth Baker.

/S/ JIM RICE

---

[2] Empirical research suggests they well may not. A 2016 publication by the Brennan Center for Justice reported that recent efforts to replace judicial elections with a commission-based appointment system have met with little or no success. "[O]ver the past three decades voters have rejected merit selection ballot measures in six states: Florida [2000], Louisiana [1989], Michigan, Ohio [1987], South Dakota [2004], and Nevada (twice) [1988 and 2010]." John F. Kowal, *Judicial Selection for the 21st Century*, 7 (Brennan Center for Justice 2016).